# Goebeler *v.* Wilhelm, Appellant.

*Libel—Meaning of words—Innuendo—Question for jury.*

If words are reasonably susceptible of a defamatory meaning as well as an innocent one, the plaintiff may by an innuendo ascribe the former meaning to them, and it will be for the jury to decide whether such meaning is truly ascribed to them; but the quality of an alleged libel, as it stands upon the record, either simply or as explained by averments and innuendo, is purely a question of law for the court, and in civil cases the court is bound to instruct the jury as to whether the publication is libelous, supposing the innuendoes to be true.

A speaker or writer is accountable for the import of his words as they will naturally be understood by the hearer or reader. The test of his liability in a civil action is not what was his secret intent, but what is the meaning of his words.

*Libel—Damages—Punitive damages—Constitutional law.*

Punitive or vindictive damages were recoverable prior to the Act of July 1, 1897, P. L. 204, in civil actions for libel, and they were given by way of punishment and with a view to promote the peace and quiet of society. In giving such damages the law blended together the interest of society and of the aggrieved individual, and gave damages not only to recompense the sufferer but to punish the offender.

The Act of July 1, 1897, P. L. 204, which provides that "in no civil action for libel shall damages be awarded beyond just restitution for injury actually sustained," was intended to prohibit the allowance of vindictive, punitive or exemplary damages or smart money, and it does not infringe any constitutional right of a party who has been injured by a libelous publication.

*Constitutional law—Title of act—Libel—Act of July 1, 1897, P. L. 204.*

Where a general title sufficient to cover all the provisions of an act is followed by specifications of the particular branches of the subject with which it proposes to deal, the scope of the act is not limited nor the validity of the title impaired, except as to such portions of the general subject as legislators and others would naturally and reasonably be led by the qualifying words to suppose would not be affected by the act. All the presumptions are in favor of the validity of statutes, and courts are not to be astute in finding objections to them.

The Act of July 1, 1897, P. L. 204, entitled "An act relating to libel and its punishment," is constitutional. The clause forbidding the giving of punitive damages is cognate to the subject expressed in the title.

Argued April 9, 1901. Appeal, No. 44, April T., 1901, by defendants, from judgment of C. P. No. 2, Allegheny Co., July T., 1898, No. 899, on verdict for plaintiff in case of Marga-

ret Goebeler v. C. Wilhelm and Margaret Wilhelm, his wife. Before RICE, P. J., BEAVER, ORLADY, W. W. PORTER and W. D. PORTER, JJ. Reversed.

Trespass for libel. Before WHITE, P. J.

From the record it appeared that the defendant, Margaret Wilhelm, wrote a letter in German, rolled the letter in some paper and threw it into the butcher shop of plaintiff's father.

The court charged in part as follows:

According to the evidence, the defendant wrote a letter in German, which is given in evidence here, rolled that letter up in some paper, and threw it into the house of the plaintiff's father. It was thrown into the butcher shop. One of the plaintiffs saw her throw it in there. She looked at it, but, not being able to read German, did not know what it meant, took it to her mother, and her mother read it and explained what it was.

Now, writing that and pitching it into the butcher shop would be a publication of this libel, if it is libelous.

The controversy here is mainly as to the interpretation of two sentences that relate to the plaintiffs. The letter is a long one and very abusive in its character, against the mother of these plaintiffs, and, I may say, against the family. The defendant's counsel, in his argument before you, read the most of this letter— I don't know but he read the whole of it—and argued to you that you must take the assertions in it as true. Not at all. There is no evidence that what is said about the mother and the family in the letter is true. You are not to take it as true simply because the defendant writes it. It may all be false; every part of it may be false. The letter shows a bad spirit, a very bad spirit, towards this family; and the evidence is that the two families were not on friendly terms. The defendant said that she had nothing against the two plaintiffs, and at one time said she had heard nothing about them, unfavorable to them, at least, in reference to what is charged here as the meaning of the language.

I shall read the whole of this letter to you, because it is necessary, I think, for you to have the whole of the letter before you, and consider the whole of it, bearing on the interpretation of these words. Mr. Sofel, our crier here in court, and our in-

terpreter, is a fine German scholar, and he has given what he says is a true interpretation of this letter.    The defendant calls a couple of German scholars, who profess to be, and probably are, fine German scholars.    They give a little different interpretation to some portions of the letter, and especially to that portion relating to the plaintiffs.    I read from the defendant's translation of this letter, addressed to Mrs. Goebeler, dated Allegheny, May 9, 1898:

" All this we have only heard, whether it is true or not we do not know.    As you know so very much about us, or at least pretend to know, we warn you that you not again spread your detestable lies and slanders, and that you retract and take back all the calumnies that you spread about us, or we will go to the right place and seek our right.    What right have you to slander us for the last three years and a half, and tell lies about us ? At least sweep away the dirt from your own door, for there it lays so thick that you can break your own necks.    In regard to the Swiss woman, as you call her, we have our full receipt. On the contrary, she owes us about $800.00.    Do you think these people are more stupid than you are yourself, and would have left their own house stand if it belonged to them ?    It would be better if you would concern yourselves about your own debts, about your own honor, about your good name, which you never possessed, and about your own children, which you have brought up so finely.    If a person should believe everything what they have heard already, then you would have sold your child in order to come to America ; then you would have your back full of debts yet ; then your daughters would have expelled your children ; then you would cheat every person who comes in contact with you ; then your daughter would have used the knife against her father.    Your children would have robbed their employer, so that he almost broke up, as long as they were in service with him.    When you needed money, you only needed to put on your specs, or go to Pittsburgh, into the club house ; then you would have money soon.    This is not at all half of what we already heard of you ; and, after all, you want to slander us and all other people.    We have borne it now long enough, and kept silent long enough, and if you do not make an end and let us go, we will seek our right ; for what you are now, and ever was, we would not like to be.    I can

look straight into anybody's face, but you can't look into any man's face for two minutes without winking your eyes. Are you really thinking that you have a good name? Oh, how stupid. People know your dirty talk, and such to whom you talk fine to others. These are the things: You were the lowest woman they ever met. Shame on you, for a woman who thinks something about herself, and she cuts her nose off to spite her own face. If you knew the nice name which you have—a very elaborated—selected name—you would not ask for it, and I believe there are few that would. Shame on you, oh, your honorable, good family, that wants to be brought up so good and so fine."

The interpretation of Mr. Sofel differs from this in some respects, perhaps, not very materially, except the language referring to the plaintiffs, but there is a difference in other respects. In this defendant's interpretation it does not charge Mrs. Goebeler with owing her anything; it charges that the Swiss woman owes her $800; not that Mrs. Goebeler owes her $800. Then there are expressions here that are used in ironical sense. You know some expressions may appear to be very complimentary, in the words used, and yet they may be intended to be used in a very different sense. Another difference is that in the defendant's interpretation many of these expressions are in what they call the subjunctive mood; for instance, the last paragraph, "Oh, you honorable, good family, that wants to be brought up so good and so fine"—the interpretation on the part of Mr. Sofel is, "Oh, you respected, good, honest family, which is brought up so good, honest and fine." Of course it is for you to say whether those words are not used in an ironical sense, to mean the very opposite.

Now, the difference is in the language of the letter that refers to the plaintiffs. The defendant's interpretation is, "about your own children, which you have brought up so finely." That may be complimentary, or may be ironical, meaning the very opposite. "If a person should believe everything what they have heard already, then you would have sold your children, in order to come to America." "You would have sold" —the other interpretation is that "you did sell." "Then you would have your back full of debts yet; then your daughters would have expelled your children." The interpretation of Mr.

Sofel is, "your daughters had rid themselves of their children." The defendant's interpretation is, "Then your daughter would have used the knife against her father." The plaintiffs' interpretation is, "Your daughter had used the knife against her father." "Your children had robbed their employer, that they almost compelled to break up, as long as they were in their service." Defendant's interpretation, "Your children would have robbed their employer, so that he almost broke up, as long as they were in service with him."

[Now, according to the testimony here these words may bear two different interpretations. It is for you, taking all this letter into consideration, and taking the circumstances, as given in evidence here, to get at the true meaning—what the defendant meant.] [1]

If I remember the testimony correctly, the plaintiffs' mother had eight children. These two were the only daughters. The defendant's interpretation of the expression "your daughters would have expelled your children," does not assert any fact in the past, but, "then your daughters would have expelled your children," speaking of the mother. The plaintiffs' interpretation is, "your daughters had rid themselves of their children." There is no evidence that these daughters ever in any way expelled, or tried to expel, the children of their mother. This letter is frequently used in the plural, referring to the family, saying, "the family;" as the last sentence winds up about the family, and it speaks about training up the children so finely. If that is used ironically, it would indicate something even against the children, the daughters. You are to take the facts into consideration, and take the drift of this letter, and determine in that way what was the meaning, and in what sense the defendant used the language here, taking into consideration, of course, the defendant's interpretation too.

If the expression was used in reference to the daughters, that they had rid themselves of their children, or even if indicating that that they had done anything towards their children, even expelled their children, or drove them out, if it referred to the daughters, it must have meant something derogatory to the character of the daughters, because they had no children. One of them was single, only about twenty years of age; the other one was recently married. Did it refer to the mother, or did it

refer to these daughters as having done something in reference to their children, accusing them of having children?—I mean accusing the daughters of having children and disposing of them in some way.   One of them, as I said, was single; never married; and the other only recently married and had a child at that time, but had been single until a short time before.   [In this abusive letter did the defendant intend to smirch the character of these girls, not only as to this, but speaking of one of them who used a knife on her father?]  [2]   Also, it speaks of both of them in one interpretation, being with the employer and even breaking up the employer, showing that the daughters were in the mind of the writer of this letter as well as the mother.   Now, if the defendant meant to smirch the character of the girls in this way, indicating that they had had illegitimate children and had disposed of them in any way, it would be slanderous, because accusing an unmarried girl of having illegitimate children is libelous, without saying they had done anything more.   It is slanderous to accuse a young girl of having a child.

Often when words are spoken in a passion, in excitement, they may be uttered without much deliberation, and very frequently when parties get into a personal altercation they may use vile or abusive language without seriously thinking about it; but when they come to write a letter, it is a deliberate act; they are presumed to think about what they are writing; think about what they say, what they write; think about the effect of what they are writing; it is not done in a passion, or done suddenly but done deliberately.   The circumstances, too, that this letter was taken by the defendant and thrown into this butcher shop, where it might be got by anybody—it was not given to Mrs. Goebeler; it was not given to the daughter; it was not sent through the mail; but it was thrown into that butcher shop and might be picked up by anybody.

If you find, gentlemen, from the evidence, that the defendant did not mean to cast any imputation upon the chastity of the daughters, but referred simply to the mother, then your verdict ought to be for the defendant; [but if you find that this language was used to smirch the character of these girls, to accuse them of want of chastity, and of having children, then it is libelous;]  [3] and it would be a serious offense, too, to accuse a young girl, only about twenty or twenty-one years of age,

of having illegitimate children— a pretty serious charge. , Even in the case of the married one, at that time, it would be a serious charge, because it may go back and antedate her marriage, may cause trouble even in the family. According to the testimony of the son of the defendant, the single daughter said she did not care much about it, but that the married daughter would not submit to it; and very properly, if it accused this married daughter of that kind of conduct, the husband and his friends would want to have her character vindicated.

[If you come to the question of damages, gentlemen, that is to be determined by what you think would be proper in view of all the facts and circumstances of the case, remembering that this was written deliberately and pitched into the butcher shop. The object of the suits here, while to recover damages, is mainly to vindicate the character of the plaintiff, to vindicate the character, not only of this married woman, but the character of the young girl. A mere nominal verdict of six and one half cents would hardly be a vindication of character, rather the contrary. It is true that in an action of this kind a verdict may be largely increased because of the ability of the defendant to pay. Where there is a malicious libel, a jury may go beyond mere compensation ; they may give a verdict in the way of smart money, where the defendant is able to pay smart money. In any case, whether the defendant is worth a cent or not, the plaintiffs would be entitled to what would be a compensation for the injury done to character.] [4] There is no particular evidence here as to the defendant's ability to pay, except the testimony of the son. The son, relating the conversation with one of the plaintiffs, said that she said that they would not stop the suit, because the defendant was able to pay.

In a great many libel suits between two women who have got to quarreling and in the passion of the moment use some slanderous, vulgar expression ; or between men, when they get into a quarrel in such cases, we overlook, and juries to a great extent, overlook the slanderous character of the words, because they were uttered in passion and under provocation. It is very different when it is put in writing, and when it relates to young women—a young girl, and also a young married woman, just recently married—very different from those quarrels between

two women who get into each others hair, or two men who are quarreling and fighting over something.

[If you find for the plaintiffs, gentlemen, you will consider what would be a proper verdict in the way of vindicating the character of these plaintiffs.] [5]

Verdict and judgment for plaintiff for $1,000. Defendant appealed.

*Errors assigned* were (1–5) above instructions, quoting them. (6) Refusal of binding instructions for defendants.

*William L. Monro,* for appellants.—The sense in which the publisher meant the language cannot be material; the true rule is, What properly may he be taken to have meant?

Compensation for the injury done to the plaintiff's character is the legal measure of damages to which he is entitled: Neeb v. Hope, 111 Pa. 155; Rose v. Story, 1 Pa. 190; Viele v. Gray, 10 Abb. Prac. 7; Act of July 1, 1897, P. L. 204; Holmes v. Holmes, 44 Ill. 168; Seely v. Alden, 61 Pa. 302.

Nothing is contemplated or mentioned in the act of 1897 that does not bear on the subject of libel: Com. v. Lloyd, 2 Pa. Superior Ct. 6; Com. v. Moore, 2 Pa. Superior Ct. 166.

The subject of the act is clearly expressed in the title: Com. v. Moore, 2 Pa. Superior Ct. 165; Com. v. Lloyd, 2 Pa. Superior Ct. 14; Philadelphia v. Ridge Ave. Ry. Co., 142 Pa. 491; Com. v. Green, 58 Pa. 233; Dorsey's App., 72 Pa. 192; Beckert v. Allegheny, 85 Pa. 191; In re Road in Phœnixville Boro., 109 Pa. 44; Sewickley Boro. v. Sholes, 118 Pa. 165; Sugar Notch Borough, 192 Pa. 355.

*Robert T. Reineman,* for appellees.

OPINION BY RICE, P. J., July 25, 1901:

If words are reasonably susceptible of a defamatory meaning as well as an innocent one, the plaintiff may by an innuendo ascribe the former meaning to them and it will be for the jury to decide whether such meaning is truly ascribed to them; but the quality of an alleged libel, as it stands upon the record, either simply or as explained by averments and innuendoes, is purely a question of law for the court, and in civil cases the

court is bound to instruct the jury as to whether the publication is libelous, supposing the innuendoes to be true: Collins v. Dispatch Pub. Co., 152 Pa. 187; Pittock v. O'Niell, 63 Pa. 253; Price v. Conway, 134 Pa. 340; Meas v. Johnson, 185 Pa. 12; Leitz v. Hohman, 16 Pa. Superior Ct. 276. It has been tersely said, " The slander and the damage consist in the apprehension of the hearers," by which we understand that the speaker or writer is accountable for the import of the words as they will naturally be understood by the hearer or reader. The test of his liability in a civil action is not what was his secret intent, but what is the meaning of his words: Hankinson v. Bilby, 16 M. & W. 445. In the present case the alleged libel was written in a foreign language. The witnesses called by the plaintiff and the defendant differed in their translation of it. As the context shows, it was to this question of fact that the remarks of the learned trial judge quoted in the first three assignments of error were directed. They were parts of his comments on the paper itself and were made with reference to the different interpretations of it that were submitted for their consideration. Standing by themselves these remarks may be subject to criticism, but we have no doubt, after a careful examination of the charge as a whole, that they were understood by the jury as referring to the meaning of the defendant as expressed in the paper. Indeed we do not see how they could have understood them otherwise. We agree with the defendant's counsel that his client would not be liable merely because she intended to defame the plaintiff, if she chose words inadequate for that purpose. But we cannot agree to his proposition that the charge of the court left the jury under the impression that it was their duty to ascertain the intent of the defendant rather than the meaning of the language used. Therefore, these assignments of error are overruled.

In charging as to the measure of damages the court instructed the jury to determine what " would be proper, in view of all the facts and circumstances of the case, remembering that this was written deliberately and pitched into the butcher shop;" that in any case the plaintiff would be entitled " to what would be a compensation for the injury done to character;" that it would be their duty to consider " what would be a proper verdict in the way of vindicating the character of these plaintiffs;" that

"where there is a malicious libel a jury may go beyond mere compensation, they may give a verdict in the way of smart money where the defendant is able to pay smart money." Aside from the objection that these instructions left it to the jury to guess what amount of a verdict would dispel possible popular belief as to plaintiffs' bad character,—there being no evidence that any person saw the libel excepting the persons libeled and the persons they showed it to—there is the objection that the jury were permitted to award punitive damages. We do not think there can be any reasonable doubt that the jury felt at liberty under the instructions to award such damages. The question is whether this is permissible in an action of libel.

"While it may be conceded that there seems to be want of logic in the idea of compensation beyond the injury, by way of punishment for the evil motives of the trespasser, yet the law is well settled that it may be given:" THOMPSON, J., in Nagle v. Mullison, 34 Pa. 48. This allowance is termed "smart money" or "exemplary" or "vindictive" or "punitive" damages. They are synonymous terms and signify an allowance given to the plaintiff "as an example to deter others:" Sommer v. Wilt, 4 S. & R. 19; Kuhn v. North, 10 S. & R. 399, 411. In McBride v. McLaughlin, 5 W. 375, it was held not to be error to charge the jury that if they believed that the defendant acted in a deceitful, harsh, cruel or oppressive manner, they might give not only compensatory but exemplary and vindictive damages. Chief Justice GIBSON, who delivered the opinion of the court, said: "Whatever be the speculative notions of fanciful writers, the authorities teach that damages may be given, in peculiar cases, not only to compensate, but to punish." Further on, he said: "Nor can it be said the wrongdoer is to suffer in order to appease the resentment of the injured; and even that vindicatory damages are in truth, compensatory. The purposes of the law are more elevated than the gratification of revenge. Mental or bodily pain is doubtless a legitimate subject of amends, produced, however, not by the infliction of suffering, but by a pecuniary equivalent. The enhancement of damages by the ability of the defendant, not being designed for the benefit of the plaintiff, must consequently be for something beyond compensation. That corrective damages may be given for the sake of example is as old as the

law itself." He concluded his opinion by saying: " The defendant was guilty of wilful oppression and he is properly punished for it. Judgment affirmed." So in the case of Tillotson v. Cheetham, 3 Johns. 56, Chief Justice KENT said: that the charge contained in the libel was calculated not only to injure the feelings of the plaintiff, but to destroy all confidence in him as a public officer; and in his opinion demanded from the jury exemplary damages, as well on account of the nature of the offense charged against the plaintiff, as for the protection of his character as a public officer, and he added, that he " did not accede to the doctrine that the jury ought not to punish the defendant, in a civil suit, for the pernicious effects which a publication of this kind was calculated to produce in society." Exemplary damages are those allowed as a punishment for torts committed with fraud, actual malice, or deliberate violence or oppression: 1 Bouv. L. Dict. (Rawle) 491. Smart money is vindictive or exemplary damages given beyond the actual damage by way of punishment and example in cases of gross misconduct of defendant: 2 Bouv. L. Dict. (Rawle) 1009. It has been said that in the exceptional cases where the jury is permitted to give such damages, the law " blends together the interest of society and of the aggrieved individual, and gives damages not only to recompense the sufferer but to punish the offender: " Sedgwick on Damages (1st. ed.) p. 39. See also 8th ed. section 457, et seq., for a full discussion of the subject. " Vindictive or retributory or exemplary damages are awarded where the jury desire to mark their sense of the defendant's harsh and unfeeling conduct by fining him to a certain extent; they therefore punish the defendant by awarding the plaintiff damages in excess of the amount which would be adequate compensation. . . . It is clearly competent to a jury to find vindictive damages in an action of libel or slander: " Odgers on Libel and Slander (Bl. ed.), 221.

We have made these extended quotations, which might be multiplied almost indefinitely, for the purpose of showing the nature of such damages and the principle upon which they are allowed, and, more particularly, to show that they are not, in truth, compensatory, but, according to the doctrine held by most courts and text writers, are given by way of punishment and with a view to promote the peace and quiet of society.

Such being their nature we cannot see that any constitutional right of the injured party is infringed by an act of the legislature declaring that in the future such damages shall not be recoverable in civil actions; in other words, that libel shall not be punished in that way. Nor is there any doubt that the 3d section of the Act of July 1, 1897, P. L. 204, which provides, that "in no civil action for libel shall damages be awarded beyond just restitution for injury actually sustained," was intended to prohibit the allowance of vindictive, punitive or exemplary damages or smart money.

But it is suggested that this section is unconstitutional because it relates to a subject not clearly expressed in the title. We are unable to adopt that view. The title is, "An act relating to libel and its punishment." So far as the section relates to the punishment of libel sufficient notice is given by the title as reasonably to lead to an inquiry into the body of the bill, and, according to numerous authorities, this is the test. A clause forbidding the giving of punitive damages would seem to be cognate to the subject expressed in the title. Where a general title sufficient to cover all the provisions of an act is followed by specifications of the particular branches of the subject with which it proposes to deal, the scope of the act is not limited nor the validity of the title impaired except as to such portions of the general subject as legislators and others would naturally and reasonably be led by the qualifying words to suppose would not be affected by the act. All the presumptions are in favor of the validity of statutes and courts are not to be astute in finding objections to them: Sugar Notch Borough, 192 Pa. 349. See also Rodebaugh v. Phila. Traction Co., 190 Pa. 358; Campbell's Case, 197 Pa. 581; Commonwealth v. Lloyd, 2 Pa. Superior Ct. 6, and cases there collected; Commonwealth v. Moore, 2 Pa. Superior Ct. 166; Commonwealth v. Jones, 4 Pa. Superior Ct. 362; Hays v. Cumberland County, 5 Pa. Superior Ct. 159; 186 Pa. 109; Baker v. Warren County, 11 Pa. Superior Ct. 170; Overseers of the Poor of Boggs Twp. v. Armstrong County, 11 Pa. Superior Ct. 175; Read v. Clearfield County, 12 Pa. Superior Ct. 419; Middletown Road, 15 Pa. Superior Ct. 167.

For the foregoing reasons we conclude that there was error in the instructions complained of in the fourth and fifth assign-

ments of error, and, as we have no means of knowing what part of the verdict was made up of punitive damages, it is manifest that we cannot declare that the error was cured by the action of the court in reducing the amount of the verdict on the hearing of the rule for a new trial.

We have confined our attention to a consideration of the correctness of the instruction as to the right of a plaintiff in an action of libel to recover punitive damages or smart money. The assignments of error do not require us to discuss other questions further than to say that the defendant's request for binding instructions in his favor was correctly refused.

Judgment reversed and a venire facias de novo awarded.

