# Good, Appellant, *v.* Grit Publishing Company.

*Libel—Judicial proceedings—Publication—Newspaper—Malice—Damages—Reputation—Evidence.*

In general, reports of judicial proceedings, if fair, impartial and truthful, and there be no express malice, may be published without incurring liability to action even though they give currency and publicity to defamatory accusations against individuals, which, otherwise, those accusations would not have.

Publication of a report of proceedings in the orphans' court are qualifiedly privileged; hence if a newspaper simply publishes a copy of the exceptions to the account of an administrator, the latter cannot recover from the proprietor of the newspaper in an action of libel without proof of express malice.

While it is true that it is not absolutely necessary that the report of judicial proceedings be verbatim in order to entitle the publisher to set up the defense of privilege, yet if he undertakes to give an abstract of matters of record, such as exceptions to an administrator's account, he is bound to publish an accurate, truthful and impartial abstract. If he uses words different from those used in the legal document to de-

scribe the allegations against the accountant, he must take care that the words he selects, the form in which they are placed, and the comments that he makes do not convey to the minds of ordinary readers an impression that the alleged wrongdoings of the accountant are more flagitious than the exceptions themselves show them to be. Failing in this, he forfeits his privilege and is liable to action as he would be if the charges he represents as having been made by the exceptant were made by himself.

Where a newspaper publishes what purports to be an abstract of exceptions to an administrator's account, and in the headlines and the preliminary statement it is said that the administrators had stolen and robbed from their father's estate, and "then tried to cover their tracks by forgeries," but the abstract of the exceptions shows that the words "stolen" and "robbed," were not used in their strictly technical sense as implying larceny and robbery, it is not the duty of the court to charge the jury that they must take the publication to mean that the plaintiff had been charged in the exceptions with having committed crimes of larceny and robbery. If in such a case the public might and probably would, understand the article to mean that the administrators and the plaintiff conspiring together had fraudulently and by means of forgeries and other dishonest methods misappropriated the funds of the estate to their own use, it is the province of the court to construe the exceptions and determine what charges of misconduct they import. If the court finds that there is nothing in the exceptions which justifies the charge of forgery, it should state this finding to the jury and instruct them, that if they came to the conclusion that the publication would convey the impression to the minds of ordinary readers that the plaintiff had been guilty of forgery, then the defendant had exceeded his privilege, the article was libelous and plaintiff might recover.

The quality of an alleged libel as it stands upon the record, either simply or as explained by averments and innuendoes, is a question of law for the court, and in civil cases the court is bound to instruct the jury as to whether the publication is libelous, supposing the innuendoes to be true.

If an article purporting to be an abstract of a judicial proceeding is not in fact a fair report of the proceeding, a republication of the article accompanied by the emphatic assertion that it was true in every particular, and other similar comments, tends to show that the first publication was not made through carelessness or inadvertence, and might be the basis of an inference that the defendant was actuated by actual malice. An instruction that the republication and the accompanying comments were not, in any aspect of the case, evidence from which the jury could infer actual malice, is error.

Where an article alleged to be libelous is given a special prominence by the use of headlines, over many other articles, although not over

all articles, the question whether the article was given an undue prominence is for the jury. The Act of May 12, 1903, P. L. 349, does not mean that special prominence over every matter published in the newspaper, is required.

If a jury finds that an article in a newspaper was not a fair report of the judicial proceedings to which it related, that it was calculated to convey the impression to ordinary readers that certain exceptions referred to, charged plaintiffs with crimes which they did not charge, that special prominence was given to the article by the use of headlines, displayed type and other matter calculated to specially attract attention, and that the defendant was actuated by special malice against the plaintiff, it is within the province of the jury to award punitive damages, but they are not bound to do so. The question is for the jury under appropriate instructions by the court as to the findings of fact which would or would not support such award.

Where a publication of a judicial proceeding does not purport to have been published upon information received from others, but upon defendant's knowledge of what the record contained, and the article is republished with emphatic assertion that it was truthful in every particular, it is not competent to show in mitigation of damages that another newspaper had previously published a substantially similar report of the same judicial proceeding. It is also irrelevant to show that the plaintiff had not published a denial of the article published in the other newspaper.

In an action for slander or libel, where the general issue is pleaded, the defendant may show in mitigation of damages the general bad reputation of the plaintiff for the particular thing with which he was charged.

Argued Oct. 31, 1907. Appeal, No. 125, Oct. T., 1907, by plaintiff, from judgment of C. P. Northumberland Co., Dec. T., 1904, No. 172, on verdict for defendant in case of O. W. Good v. Grit Publishing Company. Before RICE, P. J., PORTER, HENDERSON, MORRISON, ORLADY, HEAD and BEAVER, JJ. Reversed.

Trespass for libel. Before SAVIDGE, P. J.

The court charged as follows:

Gentlemen of the jury: This is an action by O. W. Good against Grit Publishing Company for libel. The alleged libelous article was published in the city edition of "Pennsylvania Grit" on November 1, 1903, and republished, in con-

nection with other matter, on the eighth day of the same month.

It grew out of a controversy in the orphans' court of Lycoming county over the account of the administration of the estate of John Good, father of O. W. Good, filed by a brother of the plaintiff, John C. Good, some time previous to the appearance of the article.

"Grit" did not purport to make on its own account charges against O. W. Good. What it undertook to do was to inform the public through its columns of the contents of the exceptions spoken of. This it had a right to do.

Courts constitute one of the branches of our government and all the proceedings of courts of justice are open to the public. The public has a right to know and it is proper it should be informed of what is transacted in its courts.

Newspapers are the recognized means of informing the general public of the transactions of courts of justice in any community, and they have, as such, a right to publish any and all things transacted before the court and such publication is what the law terms privileged. That means they have the privilege to publish them regardless of whether they reflect upon the parties to the litigation or upon the witnesses who appear to testify in regard to the litigation, or upon parties who may be compromised by the transactions of the court; and even though a party be charged with the highest crime, and the publication informs the world, informs its readers at large, of the fact that such a party is so charged, there can be no liability on the part of the paper making the publication, because it is publishing the transactions of a court of justice. It is privileged to tell to its readers what is going on in those courts, no difference whom it may hurt, or to what extent the parties affected thereby may be harmed in character or feelings.

But in so doing, gentlemen, they must not exaggerate, they must not be untruthful, they must not misrepresent. They must be careful to see to it that their publication or account of transactions, together with their comments upon it, fairly represent the facts as they appear in the transactions of the court—in this case in the exceptions filed to the account

of John C. Good, administrator of John Good. If they add to
what the records or proceedings show, so as to additionally
charge the party affected, they are responsible, because they
have abused the privilege which the law accords them. They
are bound to be truthful and fair in their statements and their
publications as to what is or has been going on in court. They
are privileged only to tell the truth. They are not privileged
to exaggerate. If they exaggerate so that the public is misin-
formed, and the character of the party about whom the pub-
lication is made is injured by reason of the exaggeration or the
misinformation, the paper is liable for such misinformation,
such exaggeration, such false account.

Now the contention here is, not that this communication
was not a privileged communication, not that "Grit" did not
have the right to publish an account of these exceptions,
but that "Grit" did not publish a true account of the excep-
tions; that the newspaper account represented to the public
that O. W. Good was charged in the exceptions with misconduct
and crime which, in fact, the exceptions did not charge. If
that be true, the newspaper is liable. If it be otherwise, if
the newspaper account is a fair epitome, representing in brief
what, and only what, the exceptions themselves contain or
charge, then there is no liability and cannot be any recovery.

The article is headed "O. W. and John C. Good Charged
with Having Stolen Most of Their Father's Estate. Ex-
traordinary accusation made in exceptions to account which
finds practically no estate." The article itself then goes on to
say: "Exceptions have been filed to the final account of John
C. Good, administrator of the estate of John Good, deceased,
in which it is alleged that the administrator, and his brother,
O. W. Good, robbed the estate of many thousands of dollars
and then tried to cover their tracks by forgeries and frauds of
various kinds."

That is only a small portion of the article, but that contains
the substance of the alleged untruthful representation of the
charges contained in the exceptions to the account, and the
claim to recover in this case is based almost wholly upon that
portion of that article, as it appears in this issue of November 1,

1903, and as it appeared in the same form in the issue of the following week.

[You will first have to determine what "Grit" there represents as the charges against O. W. Good, preferred by the exceptions to the account of John C. Good.  Does "Grit" tell its reading public that the exceptions to the account charge O. W. Good with the crime of larceny, forgery, robbery, conspiracy, embezzlement, or any of them?  You will have to interpret the meaning of that article.  You will have to determine what sense the average reader, the reader of ordinary intelligence, would take from the article.  Would he consider that O. W. Good had been charged in the exceptions to the account, basing his judgments solely upon what he finds in this article, with the crime of larceny, with the crime of robbery, with the crime of forgery, conspiracy or embezzlement—basing his judgment solely upon this article?  Because at the time this article was published the general public was not furnished with the exceptions themselves so that it could interpret the article in connection with the exceptions.  Those were not published by "Grit" until the following week.  Taking then the article itself, as contained in "Grit" of November 1, 1903, what interpretation do you find the average reader would put upon it?

Now it is contented by the defendant that the general reader, the average reader, would not interpret that to mean that O. W. Good had been charged with the crime of larceny, because they say you must interpret that clause, which happens to be a part of the caption or headline, and take it in connection with the other portions of the article; that that is the fair way to interpret it.  So you must.] [4]  But they contend that the charge of larceny, or the use of the term stolen, in the way in which it is used, does not necessarily mean that actual larceny had been intended in the exceptions.  That the general public would understand that it might refer to embezzlement of the funds of the estate, or cheating the heirs in any dishonest way—by trumped up accounts, or any other dishonest way.  That the general public might take that meaning of the word stolen from the article as it appears.

Also it is contended that the word robbery, as it appears in the article, would not be taken by the reading public to mean that actual robbery had been perpetrated. Robbery always implies force; the taking of the property of another by means of force. [The technical and true meaning of larceny is the felonious taking and carrying away of the personal property of another.

Now would the general public, the reading public, taking this article as it stands, or interpreting it by means of its context and with reference to any and all matters referred to in it, understands that O. W. Good was charged with the crime of larceny, or with the crime of robbery, or with the crime of forgery or embezzlement? Would that be the interpretation put upon that article by the general public? That is for you to find and not for the court.] [3]

[In order to assist you, because I believe it to be correct, I say to you that in my judgment the charge of forgery, as against O. W. Good, is fairly deducible from the exceptions filed. However, I leave it to you to find whether it is or not.

The third exception is in this language: Exceptants except to the credit of $1,628.25 alleged to have been paid on May 15, 1903, to O. W. Good upon a note dated December 2, 1899, and for the reason that the signature of John Good to said note is a forgery.

Exception four—Exceptants except to the credit of $1,015.96, alleged to have been paid on May 15, 1903, to O. W. Good on note of May 29, 1900, for the reason that the signature of John Good upon said note is a forgery.

On the other hand, I say to you that I see nothing in the exceptions to this account charging O. W. Good with the crime of larceny or robbery, but I leave it to you to say whether there is or not. I will leave it to you to say whether or not there is any other charge made than that of forgery. I am giving you my judgment only, but you are not bound by it.] [2]

If you find there is nothing in the exceptions charging him with larceny, and you further find that the publication, putting upon it the interpretation that the ordinary reader would put upon it, means to convey to the reading public that these

exceptions did charge him with larceny and robbery, you would have to find that the publication was not a fair presentation of the charges contained in the exceptions to the account, and that therefore the communication lost its privilege. Or, in other words, that there was implied legal malice and want of care. It does not make any difference what term it goes by, in that case the defendant would be liable and there should be a recovery. As I have already stated, if you find that that would not be the interpretation put upon the article, then the verdict would be the other way. It would be no libel.

So far as the forgery charge is concerned, or, rather, the information to the public in that article that the exceptions charged forgery, I do not think there can be any recovery. However, I leave it to you to say, because I do not think that the fair interpretation of the two exceptions that I have read to you would warrant the conclusion that forgery was preferred against O. W. Good by them.

Without going into the exceptions in detail I may say to you that there is enough in the exceptions to warrant a conclusion, that the conclusion would be a fair one, that conspiracy and embezzlement were charged against O. W. Good by the exceptions. However, that will be for you. If you find that to be true, and that the publication represented that these crimes had been charged, the publication in that respect was not unfair, and so far as those charges are concerned it did not lose on that account its privileged character. I leave that to you, too. But in my judgment that is very nearly all there is to this case.

[First, it is for you to put the interpretation upon this article. What does it mean to the ordinary reader of average intelligence? Does it mean and does it convey to him that the exceptions charged a crime which in fact they do not charge? If so, there can be a recovery and ought to be a recovery. Does it convey to him the information that only such crimes were charged by those exceptions as were actually charged by them? If so, "Grit" no more than told the truth and there could be no recovery.] [1]

I think I said to you at the outstart that "Grit" did not make those charges on its own account, and only intended in a condensed way to inform the public of charges that had been made by exceptants in the orphans' court of Lycoming county.

If you find the article libelous and the plaintiff entitled to recover, then you would have to assess the damages. If you find the plaintiff is not entitled to recover you will simply say we find in favor of the defendant. If you find in favor of the plaintiff it would be your duty to assess the damages at whatever you find would be right.

Now, if the plaintiff is entitled to recover, he is entitled to recover such damages as would compensate him for injury to his character and his feelings—to his character generally and to his feelings from the time of the publication of the article up to January 1, 1904. That is what is meant by the eighth point submitted by defendant's counsel, which I affirm, and which reads as follows: That the damages, if any, for which the plaintiff can recover are compensation for injury to character and injured feelings from November 1, 1903, to January 1, 1904.

By that it is not meant to restrict the injury to character to the period from November 1, 1903, to January 1, 1904, but only to injury to feeling during that period—injury to character generally, to feelings during that period of two months. It must depend upon your good judgment to determine what will compensate the plaintiff, if he is entitled to recover, for those injuries.

You have listened to the testimony, the principal part of which, so far as the oral testimony is concerned, was about the character of the defendant. It is the rule of law, which you are obliged to observe in reaching your conclusion, that the character of the defendant may be given in evidence. A man who has a bad character for honesty would not be so greatly injured according to this rule in dollars and cents as would be the man who bore a good character; hence it was that the defendant was permitted to give in evidence the character of the plaintiff at the time and before the time of the alleged libel. The plaintiff replied by witnesses that his character

was good at that time.  What was his character as to honesty?
Was it good or bad?  If bad, he didn't have so much to lose
by the aspersions which were cast upon it.  Under the law a
bad character could not be injured to the extent that a good
character could.  I do not mean by that it could not be in-
jured at all.  I do not mean because a man has a shady char-
acter as to honesty that his character cannot be further in-
jured by a charge of larceny, or robbery, or embezzlement, or
a charge such as this, if you conclude it was a libel.  It will
be for you to say whether it could be further injured, and, if
so, to what extent.  What was the character of the plaintiff?
And whether good or bad, or whatever it was, to what extent
was it injured by this article, if the article was libelous?  To
what extent compensate him on account of his character?

To what extent were his feelings injured during those two
months?  What compensation is he entitled to in dollars and
cents on that account?

You are to give only compensatory damages, only what
you may find will compensate him, but nothing to punish the
defendant, no punitive damages, which would be given for
the purpose of punishing the defendant regardless of whether
the plaintiff was entitled to them or not.  I do not think the
case is such a one as warrants punitive damages.  Give him
what will compensate him for what he has lost in character
and suffered from the injury to his feelings during the period
I have mentioned, but do not give him any more than that
for the sake of punishing this defendant, as you would have
a right to do if there were circumstances in the case which
would allow you to give punitive damages, that is, damages
to punish.

It is contended by the plaintiff that you ought to be per-
mitted to give punitive damages.  I do not think so.  The act
of assembly under which they say punitive damages ought to
be allowed reads as follows:  "And whenever in any such ac-
tion it shall be shown that the matter complained of is libelous,
and that such libelous matter has been given special promi-
nence by the use of pictures, cartoons, headlines, displayed
type, or in any matter calculated to specially attract attention,

the jury shall have the right to award punitive damages against the defendant."

I did say at one time to counsel before the argument to the jury that I would leave that to you, but it is so very plain that there were no pictures, it is not pretended there was a picture, no cartoon, and· that there was no special prominence—and special prominence means prominence given this over other matters in the paper—given to these articles by the headlines, displayed type, or in any other way, that I think you would agree with me, even if I were to leave it to you, that you could not find otherwise than as I have directed.

I have looked this paper over and I think I am perfectly fair when I say this to you. Here is the article on the second page—"O. W. and John C. Good charged with having stolen most of their Father's estate;" the same type as "A Dickinson Victory," on the same page; same as "Emma Bunting" will appear in a certain theatrical performance. Not as large as the type as that shown on the next page "Rule of the Sultan, Abdul Hamid, Responsible for Turkish Troubles." Two or three articles on the third page, same type displayed. In fact it is not as large as that used in the headlines of articles on the third page. For instance, the column headed "The People's Forum." Articles on the fifth page, several of them, such as "Ridgway Activities;" "St. Mary's Report;" "Latest from Maine;" are given the same prominence. The article complained of is given no greater prominence than those to which I have referred. In fact they are the same identical headlines, kind of types and everything. On the next page "Hughesville Budget," "News from Muncy," "Lewisburg Locals," same type. In the next week, not nearly as much display as there is in "Milton News Items," or in "Municipal Matters" on the fourth and sixth pages, and so on. I cannot see how it is possible to say that there was any special prominence, special prominence as the act requires, given to this article, either in the place it was found, which was the second page, fifth column, or in the displayed type or headline. If I thought that there was any evidence upon which you could reasonably base a finding that there was, I would leave it to you; but if you were

to find a verdict for punitive damages, based upon the proposition that there was special prominence given to this article, I would have to set aside the verdict, or, at least so much of it as represented punitive damages as could be gotten at afterwards. Hence I take that from you and say you shall only give compensatory damages, in case you find for the plaintiff.

Now the article of the next week was not, in my judgment, an aggravation of this, because nothing new was contained in it. There was no additional allegation as to charges that had been made in these exceptions, and it was proper, I think, under the circumstances that they publish the matter in the manner which they did, because in the meantime suit had been brought against them by this plaintiff, and it was no more than reasonable to expect that they would, in calling the attention of the public to this new proceeding in the common pleas court, this suit against them, it being fresh news and concerning the paper itself, because the action was against it, give more prominence in the headlines to this article. It did not profess to accuse or to give the public the information as to the grounds upon which the suit was brought, and I think it is reasonable to conclude that the defendant had the right to republish the article, together with the exceptions, so that the general public might know upon what that case was founded, and have a general knowledge of the whole business, so that they could see for themselves whether "Grit" had exceeded its privileges.

[So it comes down after all to the one main proposition, which I leave to you and which you understand, I think, gentlemen, and upon which I think you ought to base your conclusion as to the liability or non-liability of the defendant, and that is as to whether this was a libel or whether it was not. If it was, give such damages as you think will compensate the plaintiff and no more. If you conclude it was not a libelous publication give him nothing and return a verdict for the defendant.] [5]

Verdict and judgment for plaintiff for $100. Plaintiff appealed.

*Errors assigned* were (1–5) above instructions, quoting them.

*M. C. Rhone* and *A. G. Miller*, with them *James Scarlet* and *Geo. B. Reimensnyder*, for appellant.—The true rule is that in case the charge, if true, would subject the party charged to an indictment for a crime involving moral turpitude, or subject him to an infamous punishment, then the words will be in themselves actionable, and it is not necessary that the offense imputed be infamous in a technical sense: Pittsburg, etc., Pass. Ry. Co. v. McCurdy, 114 Pa. 554; Stoner v. Hoffer, 5 Lancaster Law Rev. 325; Hayes v. Press Co., Ltd., 127 Pa. 642; Davis v. Carey, 141 Pa. 314; Pittock v. O'Niell, 63 Pa. 253; Collins v. Dispatch Pub. Co., 152 Pa. 187.

The publication was not privileged: Neeb v. Hope, 111 Pa. 145; Barr v. Moore, 87 Pa. 385; Briggs v. Garrett, 111 Pa. 404; Conroy v. Pittsburg Times, 139 Pa. 334; Coates v. Wallace, 4 Pa. Superior Ct. 253; Com. v. Little, 12 Pa. Superior Ct. 636; Godshalk v. Metzgar, 23 W. N. C. 541.

We most earnestly assert that this newspaper cannot charge plaintiff with stealing, robbery and forgery and base the publication solely on the exceptions and then be permitted to introduce testimony that his reputation for truth and honesty was bad, in mitigation of damages: Moyer v. Moyer, 49 Pa. 210; Drown v. Allen, 91 Pa. 393.

A careful reading of the second publication could not fail to convince the ordinary reader of the malice which the editors of this newspaper bore toward plaintiff.

All accounts of the same transaction in other newspapers are not admissible in evidence for any purpose: Clark v. North American Co., 203 Pa. 346; Pease v. Shippen, 80 Pa. 513.

*James B. Krause* and *Seth T. McCormick*, with them *W. H. M. Oram*, for appellee.—In leaving the question of privilege to the jury the court did the appellant no harm, for the jury returned a verdict for the plaintiff and must therefore have found that the publication complained of was libelous; nothing more could have been accomplished if the court had instructed the jury that the publication was libelous per se. Had the jury

found for the appellee, a different question might have been presented: Hughes v. Bateman, 15 W. N. C. 239; Colbert v. Caldwell, 3 Grant, 181.

The test of liability in a civil action is not the secret intent, but the meaning of the words: Goebeler v. Wilhelm, 17 Pa. Superior Ct. 432; Com. v. Cochran, 23 Lanc. Law Rev. 78; Naulty v. Bulletin Co., 206 Pa. 128; Pittsburg, etc., Pass. Co. v. McCurdy, 114 Pa. 554; Jackson v. Pittsburg Times, 152 Pa. 406; Neeb v. Hope, 111 Pa. 145.

Where a privileged communication is made in good faith, the law does not imply malice from the communication itself: Briggs v. Garrett, 111 Pa. 404; Press Company v. Stewart, 119 Pa. 584; Chapman v. Calder, 14 Pa. 365; Coates v. Wallace, 4 Pa. Superior Ct. 253; Com. v. Little, 12 Pa. Superior Ct. 636.

The jury should not be allowed to find punitive damages: Longenecker v. R. R. Co., 105 Pa. 328; Hyatt v. Johnston, 91 Pa. 196.

Defendant in mitigation of damages may show that plaintiff's reputation is bad: Clark v. North American Co., 203 Pa. 346, 353; Henry v. Norwood, 4 Watts, 347; Smith v. Times Publishing Co., 178 Pa. 481.


OPINION BY RICE, P. J., May 14, 1908:

John Good, the father of the plaintiff, died intestate. John C. Good, another son, took out letters of administration upon his estate. He filed an account to which the exceptions were filed that are referred to in the newspaper articles upon which this action was brought. The particular part of the first article that is alleged to be libelous is as follows:

> "O. W. and John C. Good
> "Charged With Having Stolen Most of
> "Their Father's Estate.
> "Extraordinary Accusations Made in Exceptions to
> "Account Which Finds Practically No Estate.

"Exceptions have been filed to the final account of John C. Good, administrator of the estate of John Good, deceased, in which it is alleged that the administrator, and his brother,

O. W. Good, robbed the estate of many thousands of dollars and then tried to cover their tracks by forgeries and frauds of many kinds."

The article then detailed to some extent what the defendant alleged was the substance of the matters alleged in the exceptions, but did not set forth the exceptions verbatim. On the day following the publication of this article, the plaintiff brought an action of libel thereon in Lycoming county, and a week later the defendant republished the article together with the exceptions in full, the administrator's account and extended comments, amongst which were the following: "That statement which is reproduced below was written after careful study of the bill of exceptions filed before the auditor, the Hon. Emerson Collins, in order to verify common report. That the public may see how carefully it was prepared, the administrator's account, the bill of exceptions together with other legal matter relating to the estate filed in the orphans' court are also presented. It will quickly be seen that in the bill of exceptions the very charges can be found, which ' Grit ' said had been brought against the Messrs. Good." Later the plaintiff brought this action in Northumberland county, and declared upon the publication and republication of the part of the first article quoted at the beginning of this opinion, and the publication of the above quoted part of the comments contained in the second article. The case went to trial upon a plea of not guilty and resulted in a verdict in favor of the plaintiff for $100. From the judgment thereon he took this appeal.

It will be noticed that the defendant did not assert that the matters it alleged were charged in the exceptions were true; it simply published the charges it alleged others had made. Nevertheless, the words being defamatory, it would not ordinarily be a bar to an action for libel that the report was a truthful recital of what was asserted by others: Oles v. Pittsburg Times, 2 Pa. Superior Ct. 130, and cases there cited. An exception to this general rule is made in favor of reports of proceedings in the public courts of law. In general, such reports, if fair, impartial and truthful, and there be no express malice, may be published without incurring liability to action, even though

they give currency and publicity to defamatory accusations against individuals, which, otherwise, those accusations would not have. The reason commonly given for the exception is, that the general advantage accruing to the public from this privilege more than counterbalances all the disadvantages including the inconvenience to private persons whose conduct may be the subject of such proceedings. There are not many Pennsylvania cases in which this particular branch of the law of libel is discussed, but those that do relate to it recognize a qualified privilege as attaching to the publication of proceedings in the public courts of justice: McLaughlin v. McMakin, Bright. Nisi. Prius Rep. 132; Donnelly v. Public Ledger, 2 Phila. 57; Pittock v. O'Niell, 63 Pa. 253. It was impliedly recognized in Hayes v. Press Co., 127 Pa. 642, where it was said to be the common right of anyone to publish the fact that a judgment had been entered against a person, substantially as shown by the record of the court in which it was entered; and in Pittock v. O'Niell, SHARSWOOD, J., conceded the principle in this manner: "Had the publication been confined to the petition filed in the court of common pleas for a divorce, it might have been considered as privileged, and the plaintiff held bound to prove express malice." Upon the same ground, the publication of a report of proceedings in the orphans' court, such as are involved in this present case, must be held to be qualifiedly privileged; hence, if the defendant had simply published a copy of the exceptions to the administrator's account, the plaintiff could not recover without proof of express malice. This is plain enough.

But the first article was not, and did not purport to be, a copy of the exceptions, but purported only to be a statement in condensed form of the accusations made in the exceptions. Our attention has not been called to any Pennsylvania case which expressly decides whether or not this fact alone would deprive such an article as this of the privilege that ordinarily attaches to reports of judicial proceedings. But the text-writers generally agree, and in this they are supported by numerous decisions both American and English, that it is not absolutely necessary that the report be verbatim, in order to entitle the

publisher to set up the defense of privilege: 25 Cyclopedia of Law and Procedure, 408, and note 6 on p. 409; 18 A. & E. Ency. of Law (2d ed.), 1045; Odgers on Libel and Slander (4th ed.), 298 (1st Am. ed.), * p. 250; Townshend on Slander and Libel (4th ed.), 354. We entertain no doubt that this is true, not only of the report of the trial of a case, but also of the report of matters of record, such as exceptions to an administrator's account.

When, however, a publisher of a newspaper undertakes to give an abstract of such exceptions, instead of pursuing the more prudent course of publishing the exceptions themselves and leaving the public to judge of their import, he is bound to publish an accurate, truthful and impartial abstract. As the learned trial judge well said, he is bound to be truthful and fair in his statements as to what is or has been going on in court; he is privileged only to tell the truth; he is not privileged to exaggerate. If he uses words different from those used in the legal document to describe the allegations against the accountant, he must take care that the words he selects, the form in which they are placed and the comments that he makes do not convey to the minds of ordinary readers an impression that the alleged wrongdoings of the accountant are more flagitious than the exceptions themselves show them to be. Failing in this, he forfeits his privilege, and is held liable to action, as he would be if the charges he represents as having been made by the exceptant were made by himself.

Was this an accurate, truthful and impartial abstract of the exceptions? The appellant's counsel claim that it was not, because it represented that the exceptions charged the plaintiff and his brother with having "stolen most of their father's estate," with having 'robbed the estate of many thousands of dollars," and with having "tried to cover their tracks by forgeries and frauds of various kinds," which charges or accusations, it is claimed, are not made in the exceptions. In disposing of this question, it is necessary to determine, first, the meaning of the words "robbed" and 'stolen" in the connection in which they were used. If the meaning that is to be ascribed to them is that the plaintiff had committed the crime of robbery

and the crime of larceny, as these crimes are defined in the statute, then the publication was not an accurate and truthful abstract or report, for neither of those crimes is directly or impliedly charged in the exceptions. But this is not conclusive of the question. It is not the intention of the speaker or writer, or the understanding of any particular hearer or reader, that is to determine the actionable quality of the words. It is rather the effect which the language complained of was fairly calculated to produce and would naturally produce upon the minds of persons of ordinary understanding, discretion and candor: Thompson. v. Lewiston Daily Sun Pub. Co., 91 Me. 203; Goebeler v. Wilhelm, 17 Pa. Superior Ct. 432. The inquiry should be "what impression would be made on the mind of an unprejudiced reader who reads the report straight through, knowing nothing of the case beforehand:" Odgers on Libel and Slander (1st Am. ed.), 252. In the same connection the learned author suggests that in considering the question, isolated passages should not be too much dwelt upon, but the report should be considered as a whole. These principles are applicable as well to a newspaper article in which the writer undertakes merely to give a report of judicial proceedings, as to an article in which he speaks directly of the conduct of individuals. The word "steal" and the word "rob" have acquired many meanings by popular usage which are not equivalent to the technical definition of them in the law of crimes. In one connection they would imply the commission of the felonies of larceny and robbery, while in many other connections no such implication either of law or of fact would arise. How is it in this case? Thus far we have quoted only that part of the article which is alleged to be libelous. It is important also to look at the context. After alluding to some matters not necessary to be noticed here, the article proceeds as follows: "In this account the administrator claims to have paid to himself and to his brother, O. W. Good, three notes amounting to a total of $3,741.30, due to them from their father. No return is made of the business of John Good & Sons, it being alleged by John C. Good, the administrator, that six months before his death, the father sold to him and O. W. Good the mill property

for a consideration of $10,000. In the exceptions it is alleged that two of sundry notes paid by the administrator to O. W. Good are forgeries; and that the note to the administrator, if genuine, was obtained without consideration. It is alleged that John Good, deceased, was the head of the firm of John Good & Sons, and that the administrator, as liquidating partner of the firm, has failed to account for any part of the father's interest in that firm, he alleging that his father had no interest. It is alleged that neither he nor O. W. Good paid $10,000 for the mill property which they allege they purchased; and that judgments of John Good have been improperly assigned to others in a way that defeats the estate." This explanatory matter is in substantial accord with the exceptions, and gives the article an aspect that it would not have otherwise. Whatever else may be said of the defendant's language, it cannot be said that it was the duty of the court to charge the jury that they must take it to mean that the plaintiff had been charged in the exceptions with having committed the crimes of robbery and larceny. I cannot see that the words construed with reference to the subject matter and the context were susceptible of that interpretation. At all events, the plaintiff has no just cause to complain that that particular question was submitted to the jury.

But although it be conceded that the words considered in connection with the subject matter and the context do not import that the plaintiff was charged in the exceptions with the commission of those specific crimes, yet it must also be conceded that the public might, and probably would, understand the article to mean, that the plaintiff and the administrator, conspiring together, had fraudulently, and by means of forgeries and other dishonest methods, misappropriated the funds of the estate to their own use. This being so, the question arises whether the article so interpreted was a fair statement of what had been charged in the exceptions.

It will be well to notice briefly the functions of the court and jury in making the comparison between exceptions to an administrator's account and a publication purporting to give an abstract of them. Exceptions to an administrator's account

are legal documents and the construction of them is for the court. It is for the court to say what standard the publisher of an abstract of them must conform to in order to keep within the privilege. To be more explicit, it is the province of the court to construe the exceptions and determine what charges of misconduct they import. In a plain case it would be the duty of the court to go further and instruct the jury that the published report of them did or did not contain defamatory charges that the exceptions did not contain. See Pittock v. O'Niell, 63 Pa. 253; Pittsburg, Allegheny, etc., Pass. Ry. Co. v. McCurdy, 114 Pa. 554, and Hayes v. Press Co., 127 Pa. 642. But in a case where the published report is susceptible of two meanings, one of which is actionable and the other not, it would be the duty of the court to instruct the jury as to the legal import of the exceptions and to submit to them the question whether the report of them conveyed a different and more damaging meaning. Were it not for the explanatory matter contained in the article, this case would fall within the former class. But in view of the explanatory matter we are not convinced that the learned trial judge committed error in submitting the interpretation of the article to the jury. It remains to apply the foregoing conclusions to the facts of the case. The third exception was in these words: "Exceptants except to the credit of $1,628.25 alleged to have been paid on May 15, 1903, to O. W. Good upon a note dated December 2, 1899, for the reason that the signature of John Good to said note is a forgery." The fourth exception related to another note and was in the same terms. We have examined the other exceptions with great care and are unable to find in any of them anything that can be construed as enlarging the charges, so far as the question of forgery is concerned, beyond what the words of the third and fourth exceptions imply. But it might well be that everything alleged in these exceptions was true without imputing to the plaintiff the forgery of the notes or guilty knowledge that they were forgeries; for, it is to be noticed, it is not alleged in the exceptions that he was the payee. In short, for aught that is alleged in the exceptions he may have acquired them honestly and may have presented them for payment in igno-

rance of the fact that they were forgeries. It was not necessary for the exceptants to negative either of these inferences or presumptions in order to sustain their exceptions; nor did they negative them expressly or impliedly. On the other hand, the jury could scarcely avoid the conclusion that the publication complained of might and probably would convey the impression to the minds of ordinary readers that the plaintiff and the administrator were charged with having resorted to forgery in order to cover up their criminal misappropriation of the assets of the estate. The jury should have been instructed that this charge was not deducible from the exceptions, and that, if taking the article as a whole, they interpreted it as above, then the defendant had exceeded its privilege, the article was libelous and the plaintiff was entitled to recover. This conclusion is required by, and is in accordance with, the general rule that the quality of an alleged libel, as it stands upon the record, either simply or as explained by averments and innuendoes, is a question of law for the court, and in civil cases the court is bound to instruct the jury as to whether the publication is libelous, supposing the innuendoes to be true: Collins v. Dispatch Pub. Co., 152 Pa. 187; Pittock v. O'Niell, 63 Pa. 253; Price v. Conway, 134 Pa. 340; Meas v. Johnson, 185 Pa. 12; Binder v. Pottstown Daily News Pub. Co., 33 Pa. Superior Ct. 411.

The defense of privilege, as related to the publication of reports of judicial proceedings, may be defeated by proof of express malice, and it is claimed by plaintiff's counsel that there was inherent evidence of express malice in the second article published by the defendant. On the other hand, it is claimed, and the learned trial judge took that view, that the circumstances under which the second article was published rebutted any possible inference of express malice. We think the question was for the jury. In Barrett v. Long, 3 H. of L. Cas. 395, where there was a plea denying actual malice, and stating the publication of an apology the court said: "We are all of the opinion that under such a plea the publication of previous libels on the plaintiff by the defendant, is admissible evidence to show that the defendant wrote the libel in question with actual

malice against the plaintiff.  A long practice of libeling the plaintiff may show, in the most satisfactory manner, that the defendant was actuated by malice in the particular publication, and that it did not take place through carelessness or inadvertence, and the more the evidence approaches to the proof of a systematic practice the more convincing it is.  The circumstance that the other libels are more or less frequent, or more or less remote from the time of the publication of that in question; merely affects the weight, not the admissibility of the evidence."  Whether or not this rule should extend to publication of libels of a different nature from that charged in the declaration need not be decided in this case.  As regards repetition of the defamatory matter alleged in the declaration, the rule, having regard to the reason of it, applies as well to subsequent as to previous publications, and so the law is generally held.  See Odgers on Libel and Slander (4th ed.), 326–328; Townshend on Slander and Libel (4th ed.), sec. 392.  In one aspect of the present case the principle is applicable here.  If the first article, as interpreted by the jury, was not a fair report of the judicial proceeding, it would seem that the reiteration of it, accompanied by the emphatic assertion that it was true in every particular, and the other comments too extensive to quote here, would tend to show that the first publication was not made through carelessness or inadvertence, and might be the basis of an inference by the jury that the defendant was actuated by actual malice.  Of course we do not say that the jury were bound to draw that inference.  It was proper for the court to call their attention to the circumstances of the republication which tended to rebut the inference; but in holding, as we understand the learned judge's instructions to do, that the republication and the accompanying comments were not, in any aspect of the case, evidence from which the jury could infer actual malice, we think there was error.

The next question to be considered is as to the measure of damages.  The learned judge charged generally that there could be no recovery by the plaintiff beyond what "would compensate him for injury to his character and his feelings—to his character generally and to his feelings from the time of

the publication of the article up to the first day of January, 1904," and specifically, that there could be no recovery of punitive damages. In addition to these instructions the court refused the plaintiff's point to the effect that the jury might give punitive damages, if they found as a fact that the libelous matter complained of had been given special prominence by the use of head lines and display type and any other matter calculated to specially attract attention. This point was drawn under sec. 2 of the Act of May 12, 1903, P. L. 349, which was in force at the time of the publication and when suit was brought. The point was refused because, in the opinion of the learned judge, there was no special prominence given to the article over other matter in the paper by the use of head lines, displayed type or in any other way. It is true, as he pointed out, that many other articles were given equal, and some of them greater, prominence in the newspaper, but it is also true that it was given greater prominence than many other articles by means that were calculated to specially attract attention. We do not construe the act to mean that special prominence over every matter published in the newspaper was required. Under the evidence of the witnesses, and the evidence furnished by the newspaper itself, this was not a case for binding direction either way. The jury who heard the witnesses, and saw the newspaper, had as good opportunity as we have, or as the trial judge had, to determine the question of fact—for we can not regard it otherwise—and while it was not out of place for him to express his opinion upon it, it should have been left finally to their determination. Moreover, we are unable to conclude that if the act of 1903 were out of the way, there could be no finding of facts by the jury which would support an award of punitive damages. On the contrary, if the jury found that the article was not a fair report of the judicial proceedings to which it related, that it was calculated to convey the impression to ordinary readers that the exceptions charged the plaintiff with crimes, which they did not charge, that special prominence was given to the article by the use of headlines, displayed type and other matter calculated to specially attract attention, and that the defendant

was actuated by special malice against the plaintiff, it would have been within their province to award punitive damages, but they would not have been bound to do so. The question was for the jury under appropriate instruction by the court as to the findings of fact which would or would not support such award: Clark v. North American Co., 203 Pa. 346; Binder v. Pottstown Daily News Pub. Co., 33 Pa. Superior Ct. 411, at p. 428.

The article in question did not purport to have been published upon information received from others, but was published upon the defendant's knowledge of what the record contained. Furthermore, it was reiterated with emphatic assertion that it was truthful in every particular. In such circumstances it was not competent to show in mitigation of damages that another newspaper had previously published a substantially similar report of the same judicial proceeding: Hayes v. Press Co., 127 Pa. 642; Clark v. North American Co., 203 Pa. 346. It was also irrelevant to show that the plaintiff had not published a denial of the article published in the other newspaper. In the last cited case the court said: "All the assignments in reference to the accounts of the same transaction in other newspapers are sustained. Such accounts were not admissible in evidence for any purpose: Pease v. Shippen, 80 Pa. 513." It is argued that this means simply that they were not admissible for any purpose under the facts of that case. Assume this to be true (although, it should be noticed, some of the authorities state the rule in broader terms), yet even in that view of the decision it is authority for the general proposition that you cannot show, even in mitigation of damages, that the plaintiff's reputation had been damaged by the previous publication of the libel by another person. In such a case the law will not undertake to apportion the pecuniary injury to the plaintiff's reputation between the two wrongdoers, and we can see no substantial difference between that and an attempt to apportion the injury to his feelings.

But it was competent for the defendant to prove the general reputation of the plaintiff for honesty. The later cases establish the principle, that in an action for slander or libel, where

the general issue is pleaded, the defendant may show, in mitigation of damages, the general bad reputation of the plaintiff "for the particular thing with which he is charged:" Drown v. Allen, 91 Pa. 393; Conroe v. Conroe, 47 Pa. 198; Moyer v. Moyer, 49 Pa. 210; Neeb v. Hope, 111 Pa. 145; Clark v. North American Co., 203 Pa. 346. In the first case, where the alleged slander consisted in the charge that the plaintiff was a thief and had stolen a sheep, it was held competent to ask a witness, "What is the general reputation of the plaintiff as to being a thief?" This is cited in support of the proposition that in such a case it would not be competent to prove the general reputation of the plaintiff for honesty. We think the case does not go as far as that. But even if it does, it does not rule the case before us. The purpose for which the testimony of reputation is admitted is not to establish the probability of the truth of the charge, but to show that the plaintiff's reputation in the particular involved in the defamatory charge "is not so valuable, commercially speaking, as a reputation which is unspotted." If dishonesty is involved in the defamatory charge, as it is in this case, we think it clear that although there be an additional charge of criminality, proof of the plaintiff's bad reputation for honesty would be admissible. Therefore, there was no error in admitting such evidence in the case, or in the learned judge's comments on it in his charge to the jury.

There are twenty-three assignments of error in this case. We have not deemed it necessary to discuss them separately or in groups, but have endeavored to cover the essential points involved in the appeal, and to show wherein we agree, and wherein we are unable to agree, with the learned trial judge.

The judgment is reversed and a venire facias de novo is awarded.