## Collins, Appellant, *v.* Dispatch Publishing Co.

[Marked to be reported.]

*Libel—Definition.*

Any publication, injurious to the social character of another and not shown to be true, or to have been justifiably made, is actionable as a false and malicious libel.

*Office of an innuendo.*

The office of an innuendo is to aver the meaning of the language published; but, if the common understanding of mankind takes hold of the published words and at once, without difficulty, applies a libelous meaning to them, an innuendo is not needed, and if used may be treated as surplusage.

*Actionable words.*

The following publication is actionable per se: "Complaints from outside parties were sent to the department, one asking for his dismissal on account of intimacy with a well known young local elocutionist."

Argued Nov. 2, 1892.   Appeal, No. 170, Oct. T., 1892, by plaintiff, Stephen Collins, from judgment of nonsuit of C. P. No. 2, Allegheny Co., Jan. T., 1891, No. 418.   Before PAXSON, C. J., STERRETT, WILLIAMS, McCOLLUM, MITCHELL and HEYDRICK, JJ.

Trespass for libel.

The statement of the plaintiff's cause of action was as follows:

"That before and at the time of the committing of the several grievances hereinafter mentioned by the said defendant, the plaintiff was a married man and a person of good name, credit and reputation, and deservedly enjoyed the esteem and good opinion of divers persons, yet the defendant, well knowing the premises, and combining and wickedly and maliciously intending to injure the plaintiff in that behalf and bring him into public scandal and disgrace, heretofore, to wit, on the 12th day of November, 1890, at Pittsburgh, in the county aforesaid, falsely, wickedly and maliciously did compose and publish and cause to be composed and published and circulated in its said newspaper, of and concerning the plaintiff, a certain false, scandalous, malicious and defamatory libel, containing, among other things, the false, scandalous, malicious and defamatory libelous matters following, of and concerning the plaintiff, that is to say:

" Complaints from outside parties were sent to the department " (thereby meaning the Post-office Department of the United States), " one asking for his " (meaning thereby the said Stephen Collins) " dismissal " (meaning thereby his, the said Stephen Collins's dismissal, and meaning thereby his, the said Stephen Collins's dismissal from his position or the office as Superintendent of Mails in the Pittsburgh post-office) " on account of intimacy " (meaning thereby the intimacy of said Stephen Collins, and meaning thereby an improper and criminal relation of the said Stephen Collins) " with a well known young local elocutionist " (meaning thereby that the said Stephen Collins, said plaintiff, had committed the crime of adultery with a certain young woman whose occupation was that of elocutionist).

" By means of the committing of which said grievances by said defendant, the plaintiff hath been and is greatly injured in his good name, credit and reputation, and brought into public scandal and disgrace, and has been and is shunned by divers persons, and has been deprived of his position of office of Superintendent of Mails in the Pittsburgh post-office, and has been otherwise injured to the amount of thirty thousand dollars, and therefore he brings suit."

The portion of the publication relating to this suit was as follows :

" About six weeks ago Mr. Collins's removal was threatened on account of his personal habits. Postal Inspector Campbell left here then with the intention of having Mr. Collins removed, but the matter was smoothed over by Superintendent Collins promising to completely reform. . . . Complaints from outside parties were sent to the department, one asking for his dismissal on account of intimacy with a well-known young local elocutionist. Mr. Collins is a thoroughly competent man in postal matters, but the department has apparently taken exceptions to either his recent actions or his personal habits."

At the trial, the court held that the words of the alleged libel were not actionable per se, and that the evidence was not sufficient to support the innuendo. A compulsory nonsuit was accordingly entered, which the court refused to take off, in an opinion by WHITE, J., 1 Dist. R. 773.

*Error assigned* was refusal to strike off nonsuit.

*James S. Young, S. U. Trent* with him, for appellant.—The intention of defendant was to impute the crime of adultery. The word "intimacy" clearly meant criminal intimacy, otherwise it would be no cause for dismissal.

The communication was not privileged: Conroy v. The Times, 139 Pa. 339.

As the publication charges an indictable offence it is libelous per se, and the burden of proof is on defendant: Conroy v. The Times, 139 Pa. 339; Neeb v. Hope, 111 Pa. 145; Odgers on Libel, 93.

The words did not need an innuendo: Odgers on Slander, 77, 92; Hayes v. Press Co., 127 Pa. 648. It was a question for the jury as to what was the meaning of the alleged libel: R. R. v. McCurdy, 114 Pa. 558.

*A. M. Brown,* for appellee.—The innuendo was insufficient: Townshend on Slander and Libel, 308, 337, 338; Hewell on Defamation, 619, 620. An innuendo cannot supply the place of a colloquium. It cannot add to, enlarge, extend or change the sense of the previous words: Stitzell v. Reynolds, 59 Pa. 488; Lukehart v. Byerly, 53 Pa. 418; Gosling v. Morgan, 32 Pa. 273.

Words that do not necessarily impute criminality are, in pleading, rendered actionable only by reference to extrinsic facts, which show them to have been used in an obnoxious sense: Stitzell v. Reynolds, 59 Pa. 488; P. A. & M. Pass. Ry. v. McCurdy, 114 Pa. 554.

The communication was privileged, plaintiff being a public officer: Briggs v. Garrett, 111 Pa. 404; Press Co. v. Stewart, 119 Pa. 585.

OPINION BY MR. JUSTICE STERRETT, January 3, 1893:

As defined in Pittock v. O'Niell, 63 Pa. 258, a libel is "any malicious publication, written, printed or painted, which by words or signs tends to expose a man to ridicule, contempt, hatred or degradation of character." This definition has been employed in several other cases, among which are Neeb v. Hope, 111 Pa. 145, and Barr v. Moore, 87 Pa. 391. In the latter it was supplemented by the conclusion drawn from a consideration of numerous authorities, on the subject, in 1 Am. Lead. Cases, 115, viz.: "that any publication, injurious to the

social character of another and not shown to be true, or to have been justifiably made, is actionable as a false and malicious libel." A still more comprehensive definition, based on many well considered cases, is that given in 13 Am. and Eng. Enc. Law, 294 : " A malicious defamation expressed in print or writing, or by signs and pictures, tending to blacken the memory of the dead, with an intent to provoke the living, or to injure the reputation of one who is alive and thereby expose him to public hatred, contempt or ridicule. It may be said generally that language in writing is libelous which denies to a man the possession of some such worthy quality as every man is a priori to be taken to possess, or which tends to bring a party into public hatred or disgrace, or to degrade him in society."

As is well said in Odgers on Libel, 1, " The right of every man to have his good name maintained unimpaired is " a *jus in rem*, a right absolute and good against all the world." Words which produce any perceptible injury to the reputation of another are called defamatory, and such written or printed and published words, if false, constitute a libel. Words, pictures or signs, which on their face " must injure the reputation of the person to whom they refer, are clearly defamatory, and, if false, are actionable without proof that any particular damage has followed from their use : " Id.

The fact, that words employed by a defendant in any particular case have perceptibly injured the plaintiff's reputation, may be either presumed from the nature of the words themselves, or proved by evidence of their consequences. For obvious reasons, the presumption that words are defamatory arises much more readily in cases of libel than in cases of slander. Many words, which if printed and published would be presumed to have injured the plaintiff's reputation, will not be actionable per se, if merely spoken. A slander may be uttered in the heat of the moment, and be almost as quickly forgotten, while the same words, written and published, not only show greater deliberation and malice, but are almost certain to inflict greater and more enduring injury. " *Vox emissa volat : litera scripta manet :* " Id. 2, 3.

Where words are of dubious import the plaintiff may aver their meaning by innuendo, and the truth of the innuendo is for

the jury; but the quality of an alleged libel, as it stands upon the record, either simply, or as explained by averments and innuendoes, is purely a question of law for the court; and in civil cases the court is bound to instruct the jury as to whether the publication is libelous, supposing the innuendoes to be true. If the publication, considered either by itself or in connection with extrinsic facts, be defamatory, malice is an inference of law which the jury are bound to find according to the direction of the court: Pittock v. O'Niell, supra.

Applying these elementary principles to the facts disclosed by the record, and which the evidence tended to prove, the obvious conclusion is that a proper case for submission to the jury was presented, and that the learned court erred in refusing to take off the nonsuit.

The statement of claim, on which the issues of fact were raised by defendant's plea, is sufficient both in form and in substance. Since the procedure act of 1887, abolishing special pleadings, less formality than theretofore is required in stating a cause of action. Considered in connection with other portions of the article of which they form a part, the words complained of are clearly defamatory, even without the aid of an innuendo. In its ordinary signification, and as generally applied to persons, the word "intimacy" would be understood to mean a proper friendly relation of the parties; but, as employed in the article referred to, it has, and evidently was intended to have, a very different meaning. It conveys the idea of an improper relation, an intimacy at least disreputable and degrading, and tending, to such an extent, to unfit the plaintiff for the position he held, that "outside parties" were prompted to make complaint to the post-office department and request his dismissal. It is impossible to read the article without being constrained to reach that conclusion. On their face, without more, the words complained of are defamatory and actionable. In the statement they are laid with an innuendo which, if true, intensifies and greatly aggravates their meaning. As was said in Hays v. Press Co., 127 Pa. 648: "The office of an innuendo is to aver the meaning of the language published; but, if the common understanding of mankind takes hold of the published words and at once, without difficulty, applies a libelous meaning to them, an innuendo is not needed, and, if used, may

be treated as surplusage." In this case there was some evidence tending to sustain the meaning averred in the innuendo. But as already stated, the words upon their face, without invoking the aid of the innuendo, are defamatory and actionable; and, if the case had gone to the jury, they should have been so instructed.

The publication of the article containing the alleged libelous matter was so clearly shown that the fact cannot be doubted; and it is equally clear that the plaintiff is the person therein referred to.

For these and other reasons that might be suggested we think the case, as presented in the record, is not one in which a judgment of nonsuit should be sustained.

Judgment reversed and a procedendo awarded.