## Naulty, Appellant, *v.* Bulletin Company.

*Libel—Innuendo—Province of court and jury.*

The purpose of an innuendo is to define the defamatory meaning which the plaintiff attaches to the words ; to show how they come to have that meaning and how they relate to the plaintiff.   But it cannot be used to introduce new matter, or to enlarge the natural meaning of the words, and thereby give to the language a construction which it will not bear.

It is the duty of the court in all cases to determine whether the language used in the objectionable article could fairly and reasonably be construed to have the meaning imputed in the innuendo.   If the words are not susceptible of the meaning ascribed to them by the plaintiff and do not sustain the innuendo, the case should not be sent to a jury.

Argued March 26, 1903.   Appeal, No. 57, Jan. T., 1903, by plaintiff, from judgment of C. P. No. 1, Phila. Co., March T., 1901, No. 2892, on demurrer to statement in case of Edwin F. Naulty v. Bulletin Company.   Before MITCHELL, FELL, BROWN, MESTREZAT and POTTER, JJ.   Affirmed.

Trespass for libel.

The material portion of the plaintiff's statement was as follows :

And the plaintiff further saith that the Bulletin Company, a corporation conducting and publishing a newspaper called " The Evening Bulletin," in the city of Philadelphia, well knowing the premises, and intending to injure plaintiff and to deprive him of his good name, and further intending to cause plaintiff to lose and to be hurt in his chosen occupation as an expert in

historical matters and a promoter and manager of historical and patriotic projects, did falsely, maliciously, wickedly, and illegally make and publish of and concerning plaintiff and of and concerning plaintiff as an expert in historical matters and a promoter and manager of historical and patriotic projects as aforesaid, the following false, scandalous, illegal, defamatory and malicious writing and libel in substance as follows:

### VICE-PRESIDENTS ARE WANTED.

Philadelphian Says Harewood was built by Washington and Recites "Historical Facts" Which Are Not So.

#### SEVERAL DISTINGUISHED MEN ACCEPT.

Washington, May 16.

A distinguished gentleman in Washington, including senators, representatives, army and navy officers and others, have within the past few days received invitations to become vice-presidents of an association formed for the purchase and preservation of an alleged manor house, Harewood, said to have been built and occupied by George Washington. Genuine surprise has been caused by the receipt of these invitations, as there is high authority for the statement that Harewood, as far as George Washington's connection with it is concerned, is a castle in the air. The invitation is in the form of the following letter from the office of the secretary of the association, Edwin Fairfax Naulty, 112 S. 4th St. Philadelphia:

" Esteemed Sir: A number of gentlemen of Pennsylvania and the Virginias have banded together and formed the Washington Manor Association for the purchase and preservation of Harewood, the ancient manor house built by General Washington in 1752–56, near Charlestown, in what is now Jefferson county, West Virginia, but what was then Berkely county, Virginia. An option on the estate has been obtained from Mr. John Augustine Washington, its present owner, and a charter for the organization has been applied for. It is our purpose to raise the necessary money for the purchase of the historic old place by popular subscription, and to preserve Harewood forever for the American people as is Mount Vernon.

"It is our intention to have our Vice-Presidential Board composed of at least twenty of the most representative-men in the United States, chosen from every representative calling,

and we should like to add your name to the board. Among those who have already accepted are: General Miles, Admiral Dewey, President Eliot, of Harvard; General Joseph Wheeler, Dr. Marcus Benjamin, of the Smithsonian Institute, and General Joseph Breckinridge, Inspector-General, U. S. A. Invitations have also been sent to Chief Justice Fuller, United States Supreme Court; President Hadley, of Yale; Bishop Potter, Bishop Coleman, of Delaware; Senators Lodge, of Massachusetts; Daniel, of Virginia; Scott, of West Virginia; Penrose, of Pennsylvania; Depew, of New York; Dolliver, of Iowa, and Fairbanks, of Indiana; the Hon. Seth Low, the Hon. W. C. Whitney and others.

"Permit me to recall to your memory some of the historical associations of Harewood. It was built in 1752–56 by General Washington, and was afterward occupied by his brother, Colonel Samuel Washington. It has been in the possession of the family ever since, and is now owned by Mr. John Augustine Washington. Around its gray old walls cling some of the most romantic memories of the Colonies, Revolutionary and early Federal periods. In its great parlor James and Dolly Madison were wed, having journeyed thither from Philadelphia in Thomas Jefferson's coach for the purpose. Its roof sheltered Louis Philippe, afterward King of France, and his two brothers during their exile.

"There the young son of Lafayette found asylum during the French Revolution. Chief Justice Marshall compiled there part of the 'Life of Washington,' and Sparks part of his 'Letters of Washington.' Its halls have echoed to the tread of many a famous beauty and gallant gentleman of the olden time.

"In the parlor still stands the great black marble fireplace given by Lafayette to Washington, and placed by him at Harewood. Martha Washington planted the box hedge now growing in the garden, and Dolly Madison the famous row of lilacs which crowns the lower terrace of that bower of beauty. Thomas Jefferson said of the view from its upper windows, looking east toward Harper's Ferry, and the Blue Ridge, that 'it was worth crossing the Atlantic to see.'

"Of the 2,000 acres of land comprising the estate in General Washington's day, only 263 are now left, but these comprise

the heart of the place. Mr. Washington, the present owner, has agreed to sell the place for $500 an acre, manor house, offices, barns and outbuildings all included. The Washington Manor Association proposes to raise the money by subscriptions of $1 each, and the issuance of certificates, and we hope to accomplish this within less than two years.

"Confident that you will join our Board of Vice-Presidents, and aid us in this splendid work, I am, dear sir, yours sincerely,

"EDWIN FAIRFAX NAULTY,

" Secretary."

Several of the gentlemen who received this invitation courteously accepted it without refreshing their memory or making inquiries, and are now being advertised as vice president of the Washington Manor Association. Others more familiar with the Washingtons studied up the biographies and investigated the records in the Congressional Library, the State Department and elsewhere, and are now prepared to say that there is no justification for the existence of this association, because they say Washington never built the alleged Manor House and that no such place as Harewood has any association with the life of Washington.

Moreover, the historians say that President Madison was not married at Harewood, but in a house in Frederick county belonging to Steptoe Washington. George Washington did own land in West Virginia, which he acquired when a young surveyor, but he sold it to his brothers, Charles and Samuel, and never built a house there. He inherited Mount Vernon in 1775 when a young man, and never lived elsewhere except in an official residence.

In view of these circumstances, and especially in view of the statement in Secretary Naulty's letter that $500 an acre is to be paid for the Harewood property, some of the distinguished gentlemen who have been invited to become vice presidents of the Washington Manor Association have declined in writing and are inclined to the opinion that this well-meaning society have either been made the unwitting victims of real estate speculators or of their too eager patriotism.

That said libel was published in the Evening Bulletin on Thursday, May 16, 1901.

Plaintiff further saith that the matter contained in the headings to said publication, " Philadelphian says Harewood was built by Washington and recites historical facts which are not so" (meaning by "Philadelphian" this plaintiff). The reference in said libel to the property, as " an alleged manor house Harewood, said to have been built and occupied by George Washington." The statement therein, " That Harewood, as far as George Washington's connection with it is concerned, is a castle in the air." The statements following the copy of a letter signed by this plaintiff in said publication, all convey the innuendo and mean, and are meant to mean, that this plaintiff is not qualified in his chosen occupation as an expert in historical matters and a promoter and manager of historical and patriotic projects, and that in sending out the letter quoted in said libel and in promoting and acting as secretary of the Washington Manor Association therein referred to, he is guilty of a fraud and deception on the public and is engaged in obtaining money from the public under false pretenses.

And the plaintiff further saith that the charges in said publication and the innuendoes conveyed thereby against him are all false. That each, every and all of the historical facts contained in the letter signed by this plaintiff as to the property called Harewood and quoted in said publication are historically true.

And the plaintiff further saith that said the Bulletin Company well knew said charges and the innuendoes contained in said libel against this plaintiff to be untrue when made by it.

Plaintiff further saith that he had made extensive arrangements to lecture on the subject of the project known as the Washington Manor Association for the preservation of Harewood, referred to in said publication, from which both he individually and the said association would have derived large financial profits. That said publication and the libelous statements contained therein has and will materially injure and deprive said plaintiff of this source of income and profit.

And the plaintiff further saith that said publication is a false and malicious libel. Plaintiff denies the truth of all charges and innuendoes so injuriously made against him in said publication.

By reason of this libel plaintiff has been brought into re-

proach, said charges have been widely published and plaintiff has suffered in character and in feelings to an amount which exceeds $10,000, wherefore he brings suit.

The court sustained a demurrer to the statement.

*Error assigned* was the judgment of the court.

*William MacLean, Jr.*, for appellant.—The article as interpreted by the plaintiff was injurious to him in his profession and charged him with a criminal offense. It was therefore libelous per se. The plaintiff was entitled to go to the jury on the question of general damages : Meas v. Johnson, 185 Pa. 12; Evans v. Tibbins, 2 Grant, 451; Wildee v. McKee, 111 Pa. 335; Price v. Conway, 134 Pa. 340; Collins v. Dispatch Pub. Co., 152 Pa. 187; McIntyre v. Weinert 195 Pa. 52; Press Co. v. Stewart, 119 Pa. 584.

*R. Stuart Smith*, with him *Charles E. Morgan, Jr.*, for appellee. —The innuendoes contained in the plaintiff's statement of claim alter the natural and obvious meaning of the words published by the defendant. It is the province of the court to determine whether the words are capable of the meaning attributed to them, and the judgment entered for the defendant on the demurrer should be affirmed: Shaffer v. Kintzer, 1 Binney, 537; Gosling v. Morgan, 32 Pa. 273; Stitzell v. Reynolds, 59 Pa. 488; Pittsburg, etc., Pass. Railway Co. v. McCurdy, 114 Pa. 554; Com. v. Chambers, 39 Legal Int. 208; Hackett v. Pub. Co., 18 Rhode Island, 589 (29 Atl. Repr. 143); McGraw v. Press Co. 85 Michigan, 203 (48 N. W. Repr. 400); Wing v. Wing, 66 Maine, 62; Hunt v. Goodlake, 29 Law Times Rep. 472.

OPINION BY MR. JUSTICE MESTREZAT, May 11, 1903 :

Little need be said to sustain the judgment of the trial court. We cannot agree with the learned counsel for the appellant that the innuendoes set out in the statement are supported by the language used in the publication complained of. No fair or reasonable construction of the words in the objectionable article will warrant the innuendo, laid in the statement, " that this plaintiff is not qualified in his chosen occupation as an

expert in historical matters and a promoter and manager of historical and partriotic projects, and that in sending out the letter quoted in said libel and in promoting and acting as secretary of the Washington Manor Association therein referred to, he was guilty of a fraud and deception on the public and is engaged in obtaining money from the public under false pretenses." The tenor and effect of the article published by the defendant company was simply to deny the correctness of certain alleged historical facts set forth in the circular letter written by the plaintiff as secretary of the association. It did not impugn the motives or good faith of the writer in any way, nor by any fair intendment could it be interpreted as meaning that the " plaintiff is not qualified in his chosen occupation as an expert in historical matters and a promoter and manager of historical and patriotic projects."

The purpose of an innuendo, as is well understood, is to define the defamatory meaning which the plaintiff attaches to the words; to show how they come to have that meaning and how they relate to the plaintiff: Price v. Conway, 134 Pa. 340. But it cannot be used to introduce new matter, or to enlarge the natural meaning of the words, and thereby give to the language a construction which it will not bear: Hackett v. Providence Telegram Publishing Co., 18 R. I. 589. It is the duty of the court in all cases to determine whether the language used in the objectionable article could fairly and reasonably be construed to have the meaning imputed in the innuendo. If the words are not susceptible of the meaning ascribed to them by the plaintiff and do not sustain the innuendo, the case should not be sent to a jury. The learned trial judge sustained the demurrer in this case, and we are of opinion that he committed no error.

The judgment is affirmed.