## Clark, Appellant, *v.* Allen.

Argued May 1, 1964.   Before BELL, C. J., JONES, COHEN, EAGEN and O'BRIEN, JJ.

*Franklin L. Kury,* for appellant.

*Sanford S. Marateck,* for appellee.

*Preston L. Davis,* with him *Preston B. Davis,* for appellee.

OPINION BY MR. CHIEF JUSTICE BELL, October 26, 1964:

Joseph S. Clark brought an action of libel against Robert E. Allen, M.D. a/k/a Robert V. Allen, M.D. and Henry W. Lark, for the alleged libelous statements contained in a letter written and circulated by them opposing his candidacy for re-election to the United States Senate. Preliminary objections in the nature of a demurrer to plaintiff's amended complaint were sustained by the lower Court and from the Order dismissing the complaint, plaintiff took this appeal.

The alleged libel is contained in the following language of said letter, which appellant averred was circulated maliciously by appellees: "We are shocked at Joe Clark's record on Senate absenteeism and his A.D.A. approved voting record with its communist tendencies."

Preliminary objections (or pleadings) in the nature of a demurrer admit as true all facts which are well and clearly pleaded, but not the pleader's conclusions or averments of law: *Stahl v. First Pennsylvania Banking and Trust Company,* 411 Pa. 121, 191 A. 2d 386; *Universal Film Exchanges, Inc. v. Board of Finance and Revenue,* 409 Pa. 180, 185 A. 2d 542; *Philadelphia Minit-Man Car Wash Corp. v. Building and Construction Trades Council of Phila. and Vicinity,* 411 Pa. 585, 192 A. 2d 378.

The First Amendment to the Constitution of the United States provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press: . . ."

Article I, §7, of the Constitution of Pennsylvania provides: "Section 7. The printing press shall be free to every person who may undertake to examine the proceedings of the Legislature or any branch of government, and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty . . . ."

Libel was thus defined in *Bogash v. Elkins,* 405 Pa. 437, 440, 176 A. 2d 677: ". . . A libel is a malicious publication, expressed either in printing or writing, or by signs and pictures, which tends to blacken a person's reputation and expose him to public hatred, contempt or ridicule, or injure him in his business, trade or profession: Sarkees v. Warner-West Corp., 349 Pa. 365, 37 A. 2d 544; Collins v. Dispatch Publishing Co., 152 Pa. 187, 25 A. 546; Schnable v. Meredith, 378 Pa. 609, 107 A. 2d 860; Mengel v. Reading Eagle Co., 241 Pa. 367, 88 A. 660.

"The question of whether the language used in the allegedly defamatory article can fairly and reasonably be construed to have the libelous meaning ascribed to it by plaintiff is in the first instance a matter of law for the Court: Mengel v. Reading Eagle Co., 241 Pa., supra; McDonald v. Lee, 246 Pa. 253, 92 A. 135; Sarkees v. Warner-West Corp., 349 Pa., supra; Naulty v. Bulletin Co., 206 Pa. 128, 55 A. 862.

" 'It was the duty of the court to determine whether or not the words used were libelous per se. If they were not then in the absence of averment of special damage, binding instructions were proper:' McDonald v. Lee, 246 Pa., supra (page 255)."

See also to the same effect: *Volomino v. Messenger Publishing Co.,* 410 Pa. 611, 189 A. 2d 873; *Cosgrove Studio and Camera Shop, Inc. v. Pane,* 408 Pa. 314, 182 A. 2d 751.

In *Volomino v. Messenger Publishing Co.,* 410 Pa., supra, the Court said (pages 613-614) : "In a defamation case, it is the function of the court, in the first instance, to determine whether or not the communication complained of is capable of a defamatory meaning: Restatement, Torts, §614 (1) ; Bogash v. Elkins, 405 Pa. 437, 176 A. 2d 677 (1962) ; Cosgrove S. & C. Shop v. Pane, supra."

Notwithstanding the fact that the law of libel has been well settled for a long period of time, the Supreme Court of the United States has recently greatly broadened the concept and meaning of freedom (of the press and freedom) of speech and has greatly narrowed the meaning of libel when applied to a public official or a candidate for public office. See *New York Times v. Sullivan,* 376 U.S. 254, infra.

It is deplorable but true that during a political campaign, candidates and their supporters often indulge in gross exaggeration, invectives, distorted statements, charges of being unfit for the office sought, gross incompetence, disregard of the public interest or the welfare of our Country, prophecies of war or doom if the opponent is elected, mudslinging, half truths and outright lies which are so defamatory that they not only deeply wound the feelings of the person attacked, but undoubtedly damage his political aspirations and often (for a time) his reputation. Nevertheless, the Supreme Court has apparently taken the position that the free expression of thoughts and opinions, charges, accusations, criminations and recriminations regarding men in public life and political matters are so valuable and so essential to the preservation or improvement of our Government that they must be permitted and constitutionally protected unless they are made with actual malice.

Such charges, which are frequently made against candidates for President or Governor or Senator or

for local office—irrespective of whether the office sought is elective or appointive—are apparently privileged under the theory (a) that the people are entitled to know and discuss the life, the character and qualifications, the finances, and the innermost thoughts, motives, connections and associations of public officials and candidates for public office, as well as the likely or inevitable result of the official's or candidate's actions, connections, statements or votes, and (b) that the importance to the State and to Society of such information, charges and discussions and the advantages likely to be derived therefrom are so great, that they overbalance the harm which is often inflicted upon the persons maligned.

In *New York Times Co. v. Sullivan,* 376 U. S. 254,* the Court reversed the lower Court and set aside a large verdict obtained in a libel suit. The alleged libel appeared in a public advertisement in the New York Times; it contained defamatory and false statements regarding a public official, but no recovery was allowed in spite of the fact that a reading of its newspaper files would have disclosed to the Times the falsity of a number of statements in the advertisement. The syllabus briefly but accurately summarizes the changed law with respect to libel of a public official: "A state cannot under the First and Fourteenth Amendments award damages to a public official for *defamatory falsehood*** relating to his official conduct unless he proves 'actual malice'—that the statement was made with knowledge of its falsity or with reckless disregard of whether it was true or false. . . . (c) *Factual error, content defamatory of official reputation, or both,* are insufficient to warrant curbing free expression unless actual malice is alleged and proved. . . . (e) The evidence was constitutionally insufficient to

---

\* Decided March 9, 1964.

\*\* Italics throughout, ours.

support the judgment for respondent, since it failed to support a finding that the statements were made with actual malice . . . ."

The Court said (pages 269-270, 272, 273, 279-280, 283, 288) : "The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions. The constitutional safeguard, we have said, 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' Roth v. United States, 354 U.S. 476, 484. 'The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system.' Stromberg v. California, 283 U.S. 359, 369. '[I]t is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions,' Bridges v. California, 314 U.S. 252, 270, and this opportunity is to be afforded for 'vigorous advocacy' no less than 'abstract discussion.'

". . . Mr. Justice BRANDEIS, in his concurring opinion in Whitney v. California, 274 U.S. 357, 375-376, gave the principle its classic formulation: 'Those who won our independence believed . . . that public discussion is a political duty; and that this should be a fundamental principle of the American government . . .'

"Thus we consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.

". . . Judge EDGERTON spoke for a unanimous court which affirmed the dismissal of a Congressman's libel

suit based upon a newspaper article charging him with anti-Semitism in opposing a judicial appointment. He said: '. . . Political conduct and views which some respectable people approve, and others condemn, are constantly imputed to Congressmen. Errors of fact, particularly in regard to a man's mental states and processes, are inevitable. . . . Whatever is added to the field of libel is taken from the field of free debate.'

". . . [Governmental officials] are to be treated as 'men of fortitude, able to thrive in a hardy climate', . . .

"If neither factual error nor defamatory content suffices to remove the constitutional shield from criticism of official conduct, the combination of the two elements is no less inadequate.

*"The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'*—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.

"We hold today that the Constitution delimits a State's power to award damages for libel in actions brought by public officials against critics of their official conduct. Since this is such an action, the rule requiring proof of actual malice is applicable. . . .

". . . a finding of negligence in failing to discover the misstatements, . . . is constitutionally insufficient to show the recklessness that is required for a finding of actual malice.

"Since respondent may seek a new trial, we deem that considerations of effective judicial administration require us to review the evidence in the present record to determine whether it could constitutionally support a judgment for respondent. This Court's duty is not limited to the elaboration of constitutional principles;

we must also in proper cases review the evidence to make certain that those principles have been constitutionally applied. This is such a case, particularly since the question is one of alleged trespass across 'the line between speech unconditionally guaranteed and speech which may legitimately be regulated.' Speiser v. Randall, 357 U.S. 513, 525. In cases where that line must be drawn, the rule is that *we 'examine for ourselves the statements in issue and the circumstances under which they were made* to see . . . whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect.' Pennekamp v. Florida, 328 U.S. 331, 335; see also One, Inc., v. Olesen, 355 U.S. 371; Sunshine Book Co. v. Summerfield, 355 U.S. 372. We must 'make an independent examination of the whole record,' Edwards v. South Carolina, 372 U.S. 229, 235, so as to *assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression.*

"Applying these standards, we consider that the proof presented to show actual malice lacks the convincing clarity which the constitutional standard demands, and hence that it would not constitutionally sustain the judgment for respondent under the proper rule of law. The case of the individual petitioners requires little discussion. Even assuming that they could constitutionally be found to have authorized the use of their names on the advertisement, there was no evidence whatever that they were aware of any erroneous statements or were in any way reckless in that regard. The judgment against them is thus without constitutional support.

"As to the Times, we similarly conclude that the facts do not support a finding of actual malice . . . ."

Appellant now argues that the libel, if any, arose

only from the following part of the sentence* in the letter which we construe to mean that "Joe Clark had a voting record with Communist tendencies and his record was approved by the A.D.A."

With the exception of the highly emotional question of racism (i.e., civil rights and their solution in all their varied fields), no question or issue has divided the American people as has the subject of Communism. Communistic atheistic Russia was recognized by President Roosevelt on November 16, 1933 and the Communist Party was a legitimate political party in our Country until 1954 when it was outlawed by the Communist Control Act of Congress,** 68 Stat. 775, 50 U.S.C.A. §§841-844 (Supp. 1963). Nearly everyone will recall that a President of the United States proclaimed that Russia and her people were more democratic than the people of the United States. However, over the years, and occasionally in a month or in a week, the feelings and beliefs and the official attitude of official Washington towards Russia have fluctuated or changed.

Communism is the mortal enemy of our Country, which countless millions of Americans know threatens our life and our very existence as a nation. Communism is a ruthless political-militaristic dictatorship—for the

---

* The allegedly libelous sentence read, "We are shocked at Joe Clark's record on Senate absenteeism and his A.D.A. approved voting record with its Communist tendencies."

Senator Clark should be the last man in Pennsylvania to contend that an allegation of Senate absenteeism is libelous. One of the principal contentions he used to defeat Senator James H. Duff and win a seat in the U. S. Senate was his frequent charge, which he dramatized by an empty chair, that Senator Duff's absenteeism made him unfit for the Senate and undeserving of re-election.

** Even before the Federal proscription, the Communist Party was "declared illegal" in Pennsylvania by the Act of December 21, 1951, P. L. 1712, §1, 18 P.S. §3811, sometimes referred to as the Musmanno Act.

pretended benefit of the proletariat* under the aegis of Karl Marx—which is dedicated to the overthrow and destruction of the Government of the United States (and of all capitalistic and imperialistic Countries) and to the domination and enslavement of all non-Communist nations and peoples by sabotage, by terroristic activities and by every conceivable means and method, including force, violence, revolution and war. The Communists weekly proclaim their desire for "peaceful coexistence" while (1) frequently insulting our Country, (2) abducting American citizens, (3) violating treaty after treaty, (4) burning our embassies, (5) shooting down our fliers, and (6) committing other acts of violence and hate, including a promise to "bury" us, (7) denouncing us in the United Nations' meetings and (8) publicly threatening us in many parts of the world, (9) establishing a Communist base in Cuba 90 miles off our shore and (10) aiding that nation in its attempts to spread revolutions, hatred of the United States, and Communist forms of Government throughout Central and South America. (11) Moreover, many believe that the friendly government of China was abandoned by the policies of official Washington on the ground (a) that Chiang Kai-Shek's government was corrupt and (b) that the Chinese Communists, unlike the Russian Communists, were merely "agrarian reformers". (12) More recently, Washington denounced the sale by a British Company of busses to Cuba on the ground that it aided that Communist regime, even though it shored up the sagging economy of Britain, while we sold our wheat to Russia on the ground that it helped our economy and

---

* It is generally estimated that the Communist Party in Russia consists of less than five percent of all the 225 million Russian people; moreover, with the possible exception of a few friendly army leaders, non-party members have no voice or representation in any Governmental matters.

was visible evidence of our Country's desire to encourage a genuine peaceful coexistence with that arch-Communist Country, ignoring the indisputable fact that it aided that Communist regime. These are merely a few examples out of many more incidents which could be cited, which demonstrate how greatly many patriotic high officials in Washington have been misled and deceived by Communism and its "peaceful coexistence" line, and how ignorant they have been of its true nature and menace.

To summarize: It is a matter of widespread common knowledge that countless patriotic Americans sincerely and sharply disagree as to what actions and/or words and/or policies aid the Communist cause, or what show Communist tendencies, or what amounts to an "appeasement" of Communism, or what is a "pro-Communist," or exactly what is meant by the term "soft on Communism." While these words and expressions have a different meaning or meanings for very many Americans and often are undoubtedly intended to be derogatory, they are not libelous. In no other way can the menace and dangers of Communism be as clearly and succinctly brought home to the American people. To hold these words or any of said expressions libelous would realistically and practically put an effective stop to searching and illuminating discussion and debate with likely dire results. It is absolutely essential for the existence and preservation of our Country that opinions on such vitally important and highly controversial issues should be vigorously argued and debated, and this applies especially to persons in public life. Without such discussion, charges, countercharges and debate, not only our future welfare but, we repeat, our very existence as a free nation may be jeopardized or destroyed.

In the light of the aforesaid factual and historical background, which are matters of common knowledge,

it is obvious how very difficult, if not impossible, it is to delineate and define libel involving (a) public officials or candidates, or (b) public affairs in this Communistic field. If freedom of the press or speech collides or conflicts with libel and there exists any substantial doubt on the question of which shall apply, the protection of our Country is far more important than the protection of the reputation of a public official or a person in public life.

Certain charges or accusations have been determined by this Court to be libelous. We have decided that calling or referring to any American citizen as *a Communist, or knowingly a member of a Communist organization, or engaging in Communist activities,* is libelous per se: *Matson v. Margiotti,* 371 Pa. 188, 193, 88 A. 2d 892; *Albert Appeal,* 372 Pa. 13, 92 A. 2d 663; and we decline at this time to further limit freedom of speech in this "Communist" field.

Joseph S. Clark is certainly not a Communist and he is not accused of being a Communist.* He is only accused of a voting record with *Communist tendencies,* an expression which as we have seen, has a different meaning for millions of Americans but certainly is not the equivalent of "being a Communist, or knowingly a member of a Communist organization, or engaging in Communist activities." Governed by the decision and guided by the Opinion of the Supreme Court in *New York Times Co. v. Sullivan,* supra, we hold, *as a matter of law,* that the averments contained in the aforesaid letter are *not libelous* and we affirm the Order of the lower Court.**

---

* If Senator Clark's patriotism was challenged, or if he were accused of being a Communist, the writer of this Opinion would be one of the first to defend him. The writer has publicly and very vigorously opposed Communism ever since Russia was recognized in 1933.

** Appellant, at oral argument in this Court, asked leave to again amend his complaint in order to aver that the allegedly li-

Order affirmed.

Mr. Justice MUSMANNO and Mr. Justice ROBERTS took no part in the consideration or decision of this case.

CONCURRING OPINION BY MR. JUSTICE JONES:

I concur only in the result reached in the majority opinion. In my view, *New York Times Company v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710, commands this result.

DISSENTING OPINION BY MR. JUSTICE EAGEN:

The plaintiff, a distinguished member of the United States Senate, was a candidate for re-election. The defendants, in an effort to influence the electorate against his candidacy, circulated through the mails a letter accusing him, inter alia, of having a voting record in the Senate *with Communist tendencies*. This action in libel followed.

The complaint alleged, inter alia, that the letter was false and "maliciously" circulated. The lower court sustained preliminary objections to the complaint in the nature of a demurrer and entered a summary judgment in favor of the defendants. The correctness of this ruling is the *only* question presently before us.

It is fundamental that a demurrer admits all well-pleaded facts in the complaint. Hence, it is admitted that the accusation was false and maliciously circulated. Even so, say the majority, this does not constitute actionable libel. With this I cannot agree.

A libel is a maliciously written or printed publication which tends to blacken a person's reputation, or to expose him to public hatred, contempt or ridicule, or to injure him in his business or profession: *Volo-*

belous statements were made with actual malice. Since the statements were not libelous, it is unnecessary to consider whether they were made with actual malice and therefore the request is denied.

*mino v. Messenger Publishing Co.,* 410 Pa. 611, 189 A.
2d 873 (1963); and *Cosgrove S. & C. Shop, Inc. v.
Pane,* 408 Pa. 314, 182 A. 2d 751 (1962). It is the
duty of the Court to determine in the first instance
whether the publication is capable of a defamatory
meaning. The majority rule that the accusation in-
volved is not such. To me, this is unrealistic and with-
out foundation in fact or logic.

The letter involved clearly and unmistakably places
a communistic label on an individual who is privileged
to represent the people of the United States in one of
the highest and most responsible positions in govern-
ment. Its meaning is unambiguous and no amount of
word legerdemain can change it one iota. That it sub-
jects the accused to public aversion and contempt is to
me beyond argument.

One of the most sacred and important functions of
one serving in the United States Senate is his vote on
questions submitted to that body. It reflects his own
beliefs and convictions. To say that a Senator's vot-
ing record has communistic tendencies necessarily im-
plies that he himself possesses the same sympathies.
Thus, such an accusation not only imputes conduct in-
consistent with the proper exercise of the duties of the
office and actions in derogation of his oath (of office),
but seriously reflects upon the individual personally.

The majority opinion admits that to state one is a
Communist is defamatory per se, but concludes that
to state he has communistic tendencies is not. This
is the most tenuous of distinctions. This reasoning
neglects to evaluate the effect of the language and for-
gets that a libelous charge need not be positively and
directly asserted, but may be accomplished indirectly
in the form of innuendo and insinuation. See, *Spanel
v. Pegler,* 160 F. 2d 619 (7th Cir. 1947). Moreover,
the difference is one of degree only. The effect, which
is of primary importance, is one and the same. Fur-

ther, the majority ruling is in conflict with prior decisions of this Court and those of every other jurisdiction in the land. See, *Matson v. Margiotti,* 371 Pa. 188, 88 A. 2d 892 (1952); *Mosler v. Whelan,* 28 N. J. 397, 147 A. 2d 7 (1958); *Grant v. Reader's Digest Ass'n, Inc.,* 151 F. 2d 733 (2d Cir. 1945); *Utah State Farm Bureau Federation v. National Farm. Union Service Corp.,* 198 F. 2d 20 (10th Cir. 1952); *Spanel v. Pegler,* supra; *Toomey v. Jones,* 124 Okla. 167, 254 Pac. 736 (1926); and *MacLeod v. Tribune Publishing Co., Inc.,* 52 C. 2d 536, 343 P. 2d 36 (1959).

The majority opinion also indicates that the recent decision of the Supreme Court of the United States in *New York Times v. Sullivan,* 376 U. S. 254 (1964), precludes the present action. I do not so understand that decision. What that case holds is that a factual error in a defamatory statement published against an official's reputation does not give rise to actionable libel unless the plaintiff alleges and proves that the statements were published with actual malice. Therein it was held that the *proof at trial* did not meet this test. While the complaint in the instant case is deficient in not specifically spelling out actual malice, it was filed long before the recording of the *New York Times* opinion. Admittedly that decision changed the concept of the law of libel in important respects. In all fairness, an opportunity to amend the complaint should be afforded before a summary judgment is entered.

I dissent.

Mr. Justice COHEN joins in this dissenting opinion.