## Kanenson v. Shaffner

*Ronald M. Katzman,* for plaintiff.
*James H. Stewart,* for defendant newspaper.

DOWLING, *J.,* January 5, 1981—We have for disposition defendant Patriot News Company's motion for summary judgment in a defamation action. Our usual antipathy towards such motions must be tempered by the constitutional prohibition against abridging freedom of the press. One must approach any First Amendment restriction with the greatest of trepidation for our very liberty is bottomed on the right to speak and write unfettered by those affected, be it the government or its citizenry. While this right is not absolute*, any restriction must be closely and carefully scrutinized. Censorship, be it judicial or otherwise, played no role in our growth and greatness, has no place in our society and is entitled to no sanctuary.

---

*Justice Hugo Black consistently, and persistently, took the position throughout his service as a justice of the Supreme Court of the United States that the First Amendment, coupled with the effect of the Fourteenth Amendment on state law, completely destroyed the entire American law of defamation, and completely bars any civil action and every criminal prosecution based upon defamation.

In the instant case, defendant newspaper published an article reporting a political controversy between the Dauphin County Democratic Committee and the Women's Democratic Club of Dauphin County. The story's headline proclaimed that two persons had charged that the county Democrats had been unfair to women, and that the committee's chairman had replied that those complaining were engaging in a personal vendetta. The article stated that plaintiff, in support of the anti-women charges, had complained that the county organization had not supported her in her 1975 campaign for Dauphin County Treasurer, although she had run with the endorsement of the party, nor in her later fight for a state legislative seat. It goes on to say that plaintiff complained about not being asked to serve in the county organization after her first defeat, and that she had been discouraged from later running for a legislative seat by defendant, Shaffner. Plaintiff complained that, as a woman, she had not been allowed to participate more actively in the organization's decisions. The Chairman of the County Committee, Larry Shaffner, stated, in reply to the charge that she was excluded from active party participation, that:

"'[S]he's a liar. I'm the one who asked her to run for treasurer and she didn't know the functions of the party. Now, all of a sudden, she's an expert.'

"'Why should I give her money to run? Everyone wants me to raise money for them. I provided brochures with her name on it. Why should I finance her campaign when I have four legislative seats?', Shaffner asked.

"'I raised money for a phone bank, for money to get out the vote. I raise money for the whole ticket. I provide billboards, radio spots, ballots, a phone

bank system. She's crazy and she's a loser and [complaining] is what losers do', he said."

Shaffner stated that the committee made no contributions to individual candidates, and, in rebuttal of the sex discrimination charge, explained that women are members of the county "nominating recommendation committee", represent each precinct, and that there are two female district leaders.

Defendant newspaper contends that the words "liar" and "crazy" in the context in which they appear are not capable of a defamatory meaning. In Pennsylvania, "[a] libel is a maliciously written or printed publication which tends to blacken a person's reputation or expose him to public hatred, contempt, or ridicule or injure him in his business or profession." Cosgrove Studio and Camera Shop, Inc. v. Pane, 408 Pa. 314, 317, 182 A. 2d 751 (1962). And the issue of whether or not a writing is fairly or reasonably capable of being found libelous is a question of law for the court: Kernick v. Dardanell Press, 428 Pa. 288, 236 A. 2d 191 (1967). The words must be weighed together with their context: Restatement, 2d, Torts, §563.

In perhaps the most famous of all libel cases, New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964), Justice Brennan in remarks here relevant stated:

"Thus we consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."

In Redding v. Carlton, 223 Pa. Superior Ct. 136,

296 A. 2d 880 (1972), an allegation was made that a public official had "a conflict of interest at the very least and perhaps more." Holding that such a remark was not defamatory, Judge Hoffman stated at p. 139:

"To prevent a chilling effect on free speech, the Supreme Court of Pennsylvania has held that 'statements which represent differences of opinion or are annoying or embarrassing, are without more not libelous.' Bogash v. Elkin, 405 Pa. 437, 440, 176 A. 2d 677 (1962). Neither is a statement libelous which is 'no more than rhetorical hyperbole' or 'a vigorous epithet' used to describe what the publisher believes to be another's extremely unreasonable position. Greenbelt Cooperative Publishing Ass'n. v. Bresler, 398 U.S. 6, 14 (1970)." (Footnote omitted.)

The depositions disclosed that it was plaintiff who called the newspaper and made certain complaints and charges which generated the contact with defendant Shaffner in order to obtain his side of the controversy. Moreover, as quoted in the article, the county chairman fully explained the extent to which in his opinion her charges of discrimination were unfounded.

In Edwards v. National Audubon Society, Inc., 556 F. 2d 113, 121 (2d Cir. 1977), cert. den. 434 U.S. 1002 (1977), it was said:

"The epithet 'liar' in this context, standing by itself, merely expressed the *opinion* that anyone who persisted in misusing Audubon statistics after being forewarned could not be intellectually honest. Since the basis for this opinion was fully set forth, the communication of Clement's views cannot be libelous, however mistaken they might be.

Hotchner v. Castillo-Puche, 551 F. 2d 910 (2nd Cir. 1977)." (Emphasis in original.)

In Greenbelt Cooperative Publishing Assn., Inc. v. Bresler, 398 U.S. 6 (1970), a state legislator, engaged in negotiations with the Greenbelt City Council was the subject of two articles appearing in the local weekly characterizing his negotiating position as "blackmail." The legislator filed a lawsuit for libel, complaining that the articles imputed to him the crime of blackmail, and that because defendants knew that he had not committed such a crime, they could be held liable for the knowing use of a falsehood. The court held that the imposition of liability on such a basis was unconstitutionally impermissible, and that, as a matter of constitutional law, the word "blackmail" was not slander when spoken at the public meeting of city council and was not libel when reported by the newspaper. The court noted at p. 14:

"It is simply impossible to believe that a reader who reached the word 'blackmail' in either article would not have understood exactly what was meant: it was Bresler's public and wholly legal negotiating proposals that were being criticized. No reader could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging Bresler with the commission of a criminal offense. On the contrary, even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable. Indeed, the record is completely devoid of evidence that anyone in the city of Greenbelt or anywhere else thought Bresler had been charged with a crime." (Footnote omitted.)

A fair reading of the article in its entirety would disclose to any reasonable person that defendant Shaffner had stated nothing more than his opinion that plaintiff was not correct or accurate or truthful in her statement about lack of political party support by reason of her sex; nor would anyone believe that plaintiff was being charged with insanity or having an unsound mind or any other degree of mental incompetence. While such epithets as "liar" and "crazy" standing alone have a defamatory meaning, when viewed in the context used, their pejorative connotation and legal actionability fades away as does an odorous vapor when exposed to the outdoors. A perusal of almost any newspaper on practically any given day will disclose instances where one person is quoted as calling another a liar or as being crazy. The statements by Chairman Shaffner amounted to no more than his opinion based upon the facts set forth in the article. As the court said in Gertz v. Robert Welch, Inc., 418 U.S. 323, 339-340 (1974):

"However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." (Footnote omitted.)

In the Restatement, 2d, Torts, §566, comment c, it is stated:

"A simple expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion may be or how derogatory it is."

The words, as used in this case, resemble the words at issue in Old Dominion Br. No. 496, Nat. Ass'n. of Letter Carriers v. Austin, 418 U.S. 264

(1974), in which it was alleged that the publishing of a list of scabs and the definition thereof set forth in the publication libeled the nonunionized workers. Although that case involved freedom of expression in labor organizing and the court found the term "scab" to be literally and factually true in accordance with its dictionary definition, the definition of "scab," as published, charged plaintiffs with having "rotten principles" and lacking in "character" and with being "traitors," which were alleged by plaintiffs to be charges which were untrue and known to be untrue by defendant.

The court there concluded that there were no factual statements which were untrue, and that the words like "traitor" could not be construed as representations of fact, and that such words were obviously used in a loose figurative sense to demonstrate the union's strong disagreement with the views of those who opposed unionization.

In Kernick v. Dardanell Press, supra, where Mrs. Kernick, a township auditor, sued the commissioners and various newspapers and newspaper people for an alleged libel resulting out of a political controversy, Justice Musmanno noted former President Harry S. Truman's often-quoted remark that, "If you can't stand the heat, stay out of the kitchen," and further stated, 428 Pa. at 291-92, that:

"The statement issued by the commissioners may have caused the political pot to boil in Penn Hills township, but it is not apparent that it boiled at such temperature that it blew off the top and scalded Mrs. Kernick, or even burned her to any traumatic extent. The person who is the target of unkind words is bound to feel hurt, but he or she often exaggerates in his or her mind the extent of the damage done to his or her reputation in the public

mind. The public has many things to think about and talk about, and it does not linger on a debate which may occur at a township commissioners' meeting or on a statement issued by commissioners in the heat of an altercation.

"Whatever sensation the commissioners' statement may have caused could not have endured for any appreciable period. It could be compared to the ripple in the water caused by the passing of a rowboat, which rippling quickly tranquilizes after the dipping oars have ceased their momentary agitation. A minute later, there is nothing written in the water to suggest what had blithely passed over its serene surface. Thus, had it not been for Mrs. Kernick's lawsuit, it is to be doubted whether there would be many in Penn Hills township who could fish out of the pools of their memory the details of the Kernick-Commissioners dispute."

We conclude that the language of the article in this case is not capable of communicating a defamatory meaning, since it fully explained the circumstances as to each epithet and could not reasonably have been interpreted in context to be defamatory.

"If the alleged defamation is determined not to be so '(capable of a defamatory meaning)' as a matter of law, then the case shall be terminated prior to its going to the factfinder. Redding v. Carlton, 223 Pa. Superior Ct. 136 (1972); Gresh v. Potter McCune Co., 235 Pa. Superior Ct. 537 (1975); Doman v. Rosner, 246 Pa. Superior Ct. 616 (1977)."

In Clark v. Allen, 415 Pa. 484, 488, 204 A. 2d 42 (1964), the Supreme Court said:

"It is deplorable but true that during a political campaign, candidates and their supporters often indulge in gross exaggeration, invectives, distorted statements, charges of being unfit for the office sought, gross incompetence, disregard of the public interest or the welfare of our country, prophecies of war or doom if the opponent is elected, mudslinging, half truths and outright lies which are so defamatory that they not only deeply wound the feelings of the person attacked, but undoubtedly damage his political aspirations and often (for a time) his reputation. Nevertheless, the Supreme Court has apparently taken the position that the free expression of thoughts and opinions, charges, accusations, criminations and recriminations regarding men in public life and political matters are so valuable and so essential to the preservation or improvement of our government that they must be permitted and constitutionally protected unless they are made with actual malice."

If a newspaper were required to self-censor every exaggerated comment used in a loose, figurative sense, a depressing and debilitating effect on the constitutional guarantees of freedom of speech and press would result. This can never be countenanced.

Accordingly, we enter the following

## ORDER

And now, January 5, 1981, defendant, Patriot News Co.'s motion for summary judgment is granted.